Mark PORTER *v.* ARKANSAS DEPARTMENT of HEALTH &
HUMAN SERVICES, and Minor Children

08-359 286 S.W.3d 686

Supreme Court of Arkansas
Opinion delivered September 11, 2008

*Deborah R. Sallings*, Arkansas Public Defender Commission, for appellant.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.

*Gray Allen Turner*, Office of Chief Counsel, for appellee.

Robert L. Brown, Justice. Appellant Mark Porter appeals the circuit court's order adjudicating Porter's three teenage children, D.P., S.P., and J.P., who are appellees, to be dependent-neglected, and the circuit court's order voiding the marriage of his daughter, D.P.

On August 22, 2007, Porter and Diana Rolen,[1] Porter's ex-wife and the mother of D.P., J.P., and S.P., appeared in juvenile court for a Family in Need of Services ("FINS") hearing. The FINS hearing was in response to the alleged truancy of their

---

[1] The record refers to Rolen at different times as Roland, Rowland, and Rolan.

two minor daughters, D.P., age sixteen, and S.P., age twelve.[2] At the hearing, the appellee, Arkansas Department of Human Services ("DHS"), presented evidence that on August 10, 2007, Porter and Rolen had consented to the marriage of sixteen-year-old D.P. to Ralph Rodriguez, a thirty-four-year-old man from Mississippi.

Rolen testified at the hearing that she believed Rodriguez to be twenty-five years old. Rolen also testified that when she returned home from a vacation during the previous weekend, D.P. and Rodriguez had departed for Mississippi. Rolen added that she had given her consent to the marriage because of her fear that D.P. would "run off" otherwise.

Porter testified at the same hearing that he was called at work and asked to consent to D.P.'s marriage to Rodriguez. He left work and signed the necessary documents that provided his consent to the marriage. Although he testified that he was concerned about the marriage, he also testified that he was generally unfamiliar with Rodriguez and had not inquired into Rodriguez's past. At that point, the trial judge asked Porter why he had consented to his sixteen-year-old daughter's marriage to someone about whom he knew so little. Porter replied that he "was afraid [D.P.] would run off" and he would "never hear from her again." In response, the trial judge said, "Bad answer."

At the close of the FINS hearing, DHS moved the trial judge that Porter's three children be taken into DHS custody on an emergency basis so that law enforcement could investigate allegations that Rodriguez was a convicted sex offender.[3] The trial judge granted the motion.

On August 27, 2007, DHS filed a petition for emergency custody and dependency-neglect relating to D.P., S.P., and J.P. and alleged that the children were at risk due to the "parents' inability to provide supervision and make decisions that protect and keep them safe." DHS further alleged that the parents' consent to D.P.'s marriage to "a stranger from the internet pose[d] a grave

---

[2] There were seven children born of the marriage of Porter and Rolen. Only D.P., S.P., and J.P., who was age fourteen, were the subjects of the petition for custody and dependency-neglect.

[3] No evidence was presented at the dependency-neglect hearing to show that this allegation was true.

threat to all three children under their supervision." The trial judge agreed, and a probable-cause hearing was scheduled for August 28, 2007.

At the probable-cause hearing, Porter, DHS, and the attorneys ad litem for Porter's children stipulated that probable cause existed at the time the emergency hold was taken and that probable cause continued to exist. The trial judge accepted the parties' stipulation and found D.P. and J.P. should remain in DHS custody because their lives were in "immediate danger with the parents as the parents have failed to protect the [children]." On November 30, 2007, the attorney ad litem for D.P. filed a motion to void the marriage between D.P. and Rodriguez. The attorney ad litem asserted that the marriage should be voided because the parents' consent was given in disregard for the health and safety of D.P. and without knowledge of Rodriguez's true age.

At the adjudication hearing, which was held on December 10, 2007, Porter moved the trial judge to strike the motion to void the marriage. Porter also asked the judge to dismiss the proceedings on the basis that she could not consider his consent to the marriage, which was lawful, as a factor for dependency-neglect. Porter further asked that the judge recuse from the case because of comments made at the FINS hearing. The judge denied all of Porter's motions. Upon hearing the testimony of D.P., J.P., the DHS family service worker, D.P.'s psychotherapist, and an investigator from the Crimes Against Children Division of the Arkansas State Police, the trial judge determined D.P., S.P., and J.P. were dependent-neglected. D.P. and J.P. were ordered to remain in DHS custody while S.P. was permitted to remain with her paternal grandmother. The judge, in addition, voided the marriage of D.P. and Rodriguez on the basis that the parental consent was obtained through coercion and misrepresentation of Rodriguez's age and that D.P. lacked the mental capacity to enter into a contract of marriage. Porter now appeals both the finding of dependency-neglect and the court's order voiding the marriage.[4]

## I. *Amendment to legislative act by codification*

We first address a matter that is relevant to both the issue of the children's determination of dependency-neglect and the void-

---

[4] Rolen did not oppose a finding of dependency-neglect in the circuit court and agreed to participate in DHS's counseling services as part of the case plan. Rolen is not a party to this appeal.

ing of the marriage. That issue concerns the validity of the Arkansas Code Revision Commission's ("the ACRC") amendment to Act 441 of 2007 ("Act 441") entitled "An Act to Amend Provisions of the Arkansas Code to Reconcile Inconsistencies Regarding the Minimum Age to Marry," which raised the minimum age to marry in the State of Arkansas to eighteen years of age. Act 441 reads as follows:

> (1) In order for a person who is younger than eighteen (18) years of age and who is not pregnant to obtain a marriage license, the person must provide the county clerk with evidence of parental consent to the marriage.

> (2) The county clerk may issue a marriage license to a person who is younger than eighteen (18) years of age and who is not pregnant after the county clerk receives satisfactory evidence of parental consent to the marriage under subsection (c) of this section.

In its codification, however, the ACRC determined that the General Assembly's intent in enacting Act 441 was to set the minimum age to marry at eighteen, the sole exception being in the case of pregnancy of one party when either party was under the age of eighteen. Because of this, the ACRC removed the word "not" in Arkansas Code Annotated § 9-11-102(b)(1) and (2) immediately preceding the word "pregnant." *See* § 9-11-102(b) (Repl. 2008).

Porter urges that the ACRC had no authority to do this and, therefore, his consent to his daughter's marriage, though she was not pregnant, was lawful. The attorney ad litem for D.P., however, asserts that the statute was in force as amended by the ACRC at the time of the marriage, and that because sixteen-year-old D.P. was not pregnant at the time of the marriage, any consent by a parent was not authorized by statute, and her marriage is invalid. The trial judge disagreed and found that the ACRC did not have the authority to modify the law.

The trial judge was correct. The ACRC lacked the authority to amend Act 441 in its codification — which became § 9-11-102(b) — in a manner that changed the meaning and substance of Act 441. This is made clear in the Arkansas Code, which sets forth the powers of the ACRC to amend the Code. *See* Ark. Code Ann. § 1-2-303(d)(1) (Repl. 2008). The only provision that could possibly be read to authorize the revision in this case is § 1-2-

303(d)(1)(C), which grants the ACRC the authority to correct "manifest typographical and grammatical errors."

 Under the facts before us, the ACRC's revision manifestly changed the substance and meaning of § 9-11-102(b). In its original form, § 9-11-102(b) allows Arkansas children of any age to marry if their parents give consent to the marriage. As amended by the ACRC, the statute sets the minimum age to marry at eighteen but allows only pregnant teenagers to marry with parental consent. ACRC's revision of § 9-11-102(b) exceeded its powers, and, as a result, we hold that the original wording of Act 441 controls this case.[5]

## II. Finding of dependency-neglect

Porter contends that the trial judge's decision to remove the children from his custody was grounded entirely upon his consent to his daughter's marriage. This reliance was in error, he claims, because his consent was lawful under Act 441. Thus, Porter maintains that the trial judge violated his Fourteenth Amendment due-process right to make child-care decisions. DHS's retort is that the trial judge correctly found that the children were dependent-neglected and that this finding was supported by substantial evidence.

This court reviews findings in dependency-neglect proceedings *de novo*, but we will not reverse the trial judge's findings "unless they are clearly erroneous." *Wade v. Ark. Dep't of Human Servs.*, 337 Ark. 353, 990 S.W.2d 509 (1999). We have said that a finding is clearly erroneous when, although there is evidence to support it, the reviewing court, based on the entire evidence, is left with a definite and firm conviction that a mistake has been committed. *Id.* Furthermore, this court defers to the trial judge's evaluation of the credibility of witnesses. *Crawford v. Ark. Dep't of Human Servs.*, 330 Ark. 152, 951 S.W.2d 310 (1997).

---

[5] We note that Act 441 was amended by Act 3 of the First Extraordinary Session of 2008 to return the minimum age to marry with parental consent to seventeen for males and sixteen for females. An exception is made for when the female is pregnant, and one or both parties are under the minimum age. In that case, both parties may appear before a circuit judge to request a marriage license. The judge may then enter an order directing the county clerk to issue a marriage license, if the judge finds that the marriage is in the best interest of the parties. *See* 2008 Ark. Acts 3, 1st Ext. Sess. (effective April 2, 2008).

A "dependent-neglected juvenile" is defined by the Juvenile Code as one "who is at substantial risk of serious harm as a result of" abuse, sexual abuse, neglect, or parental unfitness to the juvenile, or a sibling. Ark. Code Ann. § 9-27-303(18)(A) (Repl. 2008). The statute goes on to define "abuse" as "injury to a juvenile's intellectual, emotional, or psychological development as evidenced by observable and substantial impairment of the juvenile's ability to function within the juvenile's normal range of performance and behavior." Ark. Code Ann. § 9-27-303(3)(A)(iii).

The statute also describes "neglect" as:

(i) Failure or refusal to prevent the abuse of the juvenile when the person knows or has reasonable cause to know the juvenile is or has been abused;

(ii) Failure or refusal to provide the necessary food, clothing, shelter, and education required by law, excluding failure to follow an individualized education program, or medical treatment necessary for the juvenile's well-being, except when the failure or refusal is caused primarily by the financial inability of the person legally responsible and no services for relief have been offered;

(iii) Failure to take reasonable action to protect the juvenile from abandonment, abuse, sexual abuse, sexual exploitation, neglect, or parental unfitness when the existence of this condition was known or should have been known;

(iv) Failure or irremediable inability to provide for the essential and necessary physical, mental, or emotional needs of the juvenile, including failure to provide a shelter that does not pose a risk to the health or safety of the juvenile;

(v) Failure to provide for the juvenile's care and maintenance, proper or necessary support, or medical, surgical, or other necessary care;

(vi) Failure, although able, to assume responsibility for the care and custody of the juvenile or to participate in a plan to assume the responsibility; or

(vii) Failure to appropriately supervise the juvenile that results in the juvenile's being left alone at an inappropriate age or in inappro-

priate circumstances, creating a dangerous situation or a situation that puts the juvenile at risk of harm.

Ark. Code Ann. § 9-27-303(36)(A).

We first address whether the trial judge erred in considering Porter's consent to his daughter's marriage as evidence of dependency-neglect. Parents, of course, have a fundamental right to direct the care and upbringing of their children. *See Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002). But the State of Arkansas has an equally compelling interest in the protection of its children. *See* Ark. Code Ann. § 9-27-102. This court has clearly and succinctly said that it will not allow the rights of parents to override a child's best interests:

> While we agree that the rights of natural parents are not to be passed over lightly, these rights must give way to the best interest of the child when the natural parents seriously fail to provide reasonable care of their minor children. Parental rights will not be enforced to the detriment or destruction of the health and well-being of the child.

*J.T. v. Ark. Dep't of Human Servs.*, 329 Ark. 243, 248, 947 S.W.2d 761, 763 (1997) (quoting *Burdette v. Dietz*, 18 Ark. App. 107, 109, 711 S.W.2d 178, 180 (1986)).

The evidence before the trial judge was that D.P.'s parents allowed her, as a fifteen-year-old, to date a thirty-four-year-old man, without appropriate supervision. The evidence showed that D.P. and Rodriguez had inappropriate sexual contact before their marriage, including the posting of sexually exploitative pictures on the internet. Moreover, D.P.'s parents consented to her marriage without inquiring into Rodriguez's age or background and allowed her to drop out of school and move to Mississippi. This easily qualifies as evidence of Porter's "failure to appropriately supervise D.P.," which resulted in her being "left alone . . . in inappropriate circumstances, creating a dangerous situation." *See* Ark. Code Ann. § 9-27-303(36)(A)(vii). The trial judge was correct to consider this factor in determining dependency-neglect.

We turn next to the issue of whether there is sufficient evidence overall to support the trial judge's finding of dependency-neglect. In addition to D.P.'s relationship with Ro-

driguez, the trial judge placed great weight on the testimony of D.P.'s therapist, Linda VanBlaricom, who testified that she believed D.P. had been neglected. Ms. VanBlaricom stated that D.P.'s problems were 95% to 99% the result of her parents' failure to provide a stable and nurturing environment and her exposure to substance abuse. She further testified that D.P. "perceives that [Porter] had abandoned her a great deal," and that "[g]iven [D.P.'s] long history of being the victim of neglect/trauma, attendance in multiple schools, placement in multiple home settings, her parent's substance abuse and mental illnesses, etc., [D.P.] has developed a lack of trust in most adults and institutions."

The record further shows that Porter neglected to provide the necessary education, as required by law, for S.P. and D.P., as evidenced by the fact that the instant case began as a FINS case when S.P and D.P. were reported for severe truancy. *See* Ark. Code Ann. § 9-27-303(36)(A)(ii). After D.P. came into the care of the state, an assessment also revealed that she was not current in her immunizations. This is evidence that Porter neglected D.P.'s medical care. *See* Ark. Code Ann. § 9-27-303(36)(A)(v). Additionally, it is clear from the record that Porter failed to provide appropriate shelter, as required by law, and failed, although able, to assume responsibility for the care and custody of D.P. and J.P. *See* Ark. Code Ann. § 9-27-303(36)(A)(ii) and (vi). This is shown by the fact that Porter had legal custody of D.P. and J.P., and yet at the time this action was commenced, both children were living with their mother, whom Porter knew to have substance-abuse problems.

With respect to J.P. and S.P., Robert Leal, an investigator with the Crimes Against Children Division of the Arkansas State Police, testified that he had recommended a "true finding" that J.P. had sexual contact with four of his siblings at both Porter's and Rolen's house. This demonstrated neglect by Porter inasmuch as he failed to notice or prevent the repeated sexual contact between J.P. and his siblings. *See* Ark. Code Ann. §§ 9-27-303(18)(A)(iii) and 9-27-303(36)(A)(i).

██ We conclude that there was sufficient evidence for the trial judge to find that Porter had failed to provide for the essential and necessary mental and emotional needs of his children. *See* Ark. Code Ann. § 9-27-303(36)(A)(iv). There was also sufficient evidence, based on this testimony, to find that Porter's behavior constituted abuse, as it had caused injury to D.P.'s emotional and psychological development. *See* Ark. Code Ann. § 9-27-

303(3)(A)(iii). In sum, there was sufficient evidence to find that Porter's conduct supported a finding of dependency-neglect for all three children.

There is one related point. Even if D.P.'s marriage to Rodriguez is found to be valid, which we hold that it is in this opinion, the result in this case regarding DHS's custody of D.P. will not change.

Arkansas law makes this point abundantly clear by providing that "[a]ny juvenile within this state may be subjected to the care, custody, control, and jurisdiction of the circuit court." Ark. Code Ann. § 9-27-305. Further, a juvenile is defined as "an individual who is [f]rom birth to eighteen (18) years of age, whether married or single." Ark. Code Ann. § 9-27-303(32)(A).

■ Other jurisdictions support the principle of court jurisdiction over juveniles regardless of marriage. *See generally* W.R. Habeeb, Annotation, *Marriage as Affecting Jurisdiction of Juvenile Court Over Delinquent or Dependent*, 14 A.L.R.2d 336 (1950). For example, in the case of *In re H.G.*, the Supreme Court of Iowa held that the marriage of a sixteen-year-old girl on the day before she was set to enter state custody did not affect the jurisdiction of the juvenile court or its ability to take action in regard to her discipline and control. 601 N.W.2d 84 (Iowa 1999). The court said that "the need to achieve the goals of the juvenile process must be paramount to any rights acquired by the child through marriage." *Id.* The court further noted that the juvenile court was in a better position to assess the effect of the marriage and the possibility that it might eliminate the need for continued state intervention. *Id.*; *see also State ex rel. Johnson v. Wiecking*, 274 N.W. 585 (Minn. 1958). In short, the validity of D.P.'s marriage to Rodriguez has no effect on the State's ability to assume custody over D.P. and for our courts to order the same.

### III. Voiding the marriage

At the dependency-neglect adjudication hearing, the trial judge declared the marriage between D.P. and Rodriguez void on the following grounds: (1) misrepresentation of Rodriguez's age under § 9-11-104; (2) the marriage was not in D.P.'s best interest and was incompatible with the goal of reunification with her parents; and (3) D.P., a necessary party to the marriage contract,

lacked the mental capacity to enter into the marriage. Porter contends that the trial judge had no authority under Arkansas law to declare D.P.'s marriage void.

In Arkansas, we presume marriages conducted in legal form to be valid and "the presumption stands until overcome by positive proof." *Sims v. Powell's Estate,* 245 Ark. 493, 432 S.W.2d 838 (1968). Annulment, like divorce, is a creature of statute and can be granted only upon proof of a statutory ground. *See Phillips v. Phillips,* 182 Ark. 206, 31 S.W.2d 134 (1930). A circuit court is without authority to grant an annulment for any cause other than one provided by statute. *Id.*

### a. Misrepresentation

It is true that a marriage contract may be set aside and annulled upon the application of a parent or guardian, where there has been a misrepresentation of age by a contracting party. Ark. Code Ann. § 9-11-104 (Repl. 2008). In a suit to annul a marriage contract, misrepresentation must be proved by clear and convincing evidence. *See Shatford v. Shatford,* 214 Ark. 612, 217 S.W.2d 917 (1949). As a general rule, the same quantum of evidence is required to set aside a marriage contract for misrepresentation as is required to set aside any other written contract. *See id.*

In the present case, there is no clear and convincing evidence that Rodriguez misrepresented his age or that D.P. misrepresented his age to her parents. Both of D.P.'s parents testified at the FINS hearing that they believed Rodriguez to be in his twenties, but neither asserted that a misrepresentation had taken place. Porter testified, "I had the impression he was in his mid-20s, but when I seen him he looks like he's over 30." Additionally, the marriage certificate that both parents signed listed Rodriguez's true age as thirty-four.

Nor does it appear from the record that either parent relied upon Rodriguez's age in giving his or her consent to the marriage. Porter's ex-wife, Rolen, testified at the FINS hearing that she allowed her daughter to date a thirty-four-year-old man and, again, Porter noted that Rodriguez appeared to be over thirty. Furthermore, Porter testified that he had reservations about allowing his daughter to date a thirty-four-year-old man and had voiced these reservations to D.P. The facts simply do not rise to the level of clear and convincing evidence that either Rodriguez or D.P. misrepresented his age, but rather exhibit extreme carelessness on the part of the parents in supervising D.P.

*b. Incompatibility with reunification and the best interests of D.P.*

 ■ The trial judge's stated ground for declaring the marriage void included her finding that the marriage was incompatible with the goal of reunification of D.P. with her father and that the marriage was not in D.P.'s best interests. This is not a ground for voidance set out by statutory law. Hence, there is simply no statutory basis for granting an annulment on these grounds. *See Phillips*, 182 Ark at 206, 31 S.W.2d at 135 ("[N]o decree of annulment can be had except for causes mentioned in the statute.").

*c. Mental capacity*

Arkansas Code Annotated § 9-12-201 (Repl. 2008) provides:

> When either of the parties to a marriage is incapable from want of age or understanding of consenting to any marriage, . . . or when the consent of either party shall have been obtained by force or fraud, the marriage shall be void from the time its nullity shall be declared by a court of competent jurisdiction.

The trial judge found D.P.'s marriage to be void on grounds that D.P. lacked the mental capacity to enter into marriage based on this statute. In support of this finding, the trial judge pointed to the testimony of D.P.'s therapist regarding D.P.'s emotional state and unfitness to make decisions; the fact that D.P. had met Rodriguez on the internet; D.P.'s immaturity based on her testimony that she was ready to have children and was not using contraception; and D.P.'s behavior at trial, which included outbursts, making faces at attorneys, refusal to cooperate, and an inability to control her emotions that was so disruptive that it eventually lead to D.P.'s being handcuffed and placed in a holding cell.

Generally, a party lacks the mental capacity to enter into a contract for marriage if that party is "incapable of understanding the nature, effect, and consequences of the marriage." 4 Am. Jur. 2d *Annulment of Marriage* § 30; *see also Johnson v. Johnson*, 104 N.W.2d 8 (N.D. 1960) ("[T]he best accepted test . . . is whether there is a capacity to understand the nature of the contract and the duties and responsibilities which it creates."). The relevant inquiry is whether mental incapacity existed at the very time the parties

entered into the marriage. *Johnson,* 104 N.W.2d at 14. As a collateral point, immaturity of the parties is not sufficient to establish a party's inability to consent to marriage. *In re Marriage of Helsel,* 223 Mont. 85, 723 P.2d 963 (1986). Nor does the mental capacity necessary to enter into marriage require the ability to exercise "clear reason, discernment, and sound judgment." *Beddow v. Beddow,* 257 S.W.2d 45 (Ky. 1953).

Here, no inquiry was made by the trial judge into D.P.'s mental capacity at the time the parties entered into the marriage. The trial judge based the majority of her decision upon D.P.'s behavior at trial, which is an insufficient basis for finding mental incapacity. Furthermore, D.P.'s therapist, Linda VanBlaricom, testified that D.P. had a "strong sense of herself" was a "bright girl" and "had learned to make decisions . . . and been responsible for herself in a lot of ways for a long time." Ms. VanBlaricom added that D.P. was not necessarily able to use the judgment of an adult, but the immaturity of D.P. or her inability to exercise sound judgment are not factors for mental incapacity. As a final point, in response to the question of whether she believed D.P. mature enough to marry, Ms. VanBlaricom responded that she would have a very hard time answering that question about most people.

Taken together, the evidence from the record does not show that D.P. was incapable of understanding the nature, effect, and consequences of marriage. We hold that the trial judge erred in declaring the marriage void on the basis of misrepresentation, best interest of D.P., or mental incapacity. We reverse the trial judge on this point and remand for entry of a judgment in accordance with this opinion.

*IV. Recusal*

Porter raises, as his final point, that the trial judge abused her discretion in refusing to recuse from this case based on the trial judge's statements at the FINS hearing. Specifically, Porter cites the following exchange that occurred during the direct examination of Porter at that hearing:

> THE COURT: I've just got to stop because this is just the most ridiculous thing I've ever heard of and if you're not going to ask the million-dollar question, I guess I'm going to ask the million-dollar question. Why on God's earth,

would you sign a consent to allow her to marry someone you hardly know, you hardly met, you know nothing about his background?

PORTER: I was afraid she would run off and I'd never hear from her again.

THE COURT: Bad answer. Bad Answer.

PORTER: I understand that, but I was afraid of that.

THE COURT: No, you don't. No, you don't. Bad answer.

The trial judge denied Porter's motion to recuse, asserting that she had not prejudged the merits of the case.

A judge has a duty to hear a case unless there is a valid reason to disqualify. *Perroni v. State*, 358 Ark. 17, 186 S.W.3d 206 (2004). Moreover, a judge is presumed to be impartial, and the party seeking recusal must demonstrate bias. *Nash v. Hendricks*, 369 Ark. 60, 250 S.W.3d 541 (2007). A judge must refrain from hearing a case in which he or she might be interested and must avoid all appearances of bias. *Dolphin v. Wilson*, 328 Ark. 1, 942 S.W.2d 815 (1997); *see also* Ark. Code of Judicial Conduct Canon 3B(5). This court, however, will not reverse a judgment on the basis of a trial judge's decision not to disqualify unless the judge has abused his or her discretion. *Id.* In determining whether there was an abuse of discretion, this court reviews the record to determine if any prejudice or bias was exhibited. *Id.* The question of bias is generally confined to the conscience of the judge. *Id.*

■ Despite saying at the FINS hearing that Porter gave a "bad answer" to the question of why he consented to his daughter's marriage, we hold that the trial judge did not abuse her discretion by denying the motion for recusal. The trial judge told the parties that her statement "in no way addressed the merits" and that "the fact that [the] court felt that [Porter] made a bad choice is not an indication of the court's future rulings." She further explained that she would apply the law in a fair and impartial manner.

Porter also contends that the trial court's failure to transfer the case was a violation of the Administrative Plan for the 20th

Judicial District (the "Plan"). This Plan was adopted pursuant to Administrative Order No. 14 of the Arkansas Supreme Court. According to the Plan, the trial judge's division, the 4th division, was responsible for "20% of all civil cases and all juvenile delinquency and Family in Need of Services cases filed in the Juvenile Division of Circuit Court," while "all dependency-neglect" cases were assigned to the 5th division. The trial judge noted that the Plan reads that "it is preferable for the judge assigned to a case to handle all proceedings pertaining to that case." Therefore, because the FINS hearing had necessitated the dependency-neglect hearing, the trial judge had jurisdiction. Porter now contends on appeal that the FINS hearing and the dependency-neglect hearings are separate and distinct cases.

It does not appear that Porter has preserved this argument on appeal because he did not raise this issue to the trial judge. Although lack of subject-matter jurisdiction may not be waived and may be raised for the first time on appeal, Porter does not specifically contest the trial judge's subject-matter jurisdiction. Rather, he argues that the trial judge lacked the power to hear the case pursuant to this court's holding in *Foster v. Hill*, 372 Ark. 263, 275 S.W.3d 151 (2008), which was decided on "grounds wholly unrelated to subject-matter jurisdiction."

It is clear that the trial judge had subject-matter jurisdiction in this case. Circuit courts are established as the trial courts of original jurisdiction of all justiciable matters not otherwise assigned. Ark. Const. amend. 80, § 6(A); *Foster v. Hill, supra.* Under Administrative Order 14, the creation of divisions shall in no way limit the powers and duties of the judges to hear all matters within the jurisdiction of the circuit court.

Regarding the authority of the trial judge to hear the dependency-neglect matter under that district's administrative Plan, we repeat that this court has not found where this specific issue was raised at the trial level. It is well established that an appellant must raise an issue and make an argument to the circuit court for it to be preserved on appeal. *Strong v. State*, 372 Ark. 404, 277 S.W.3d 159 (2008). Accordingly, we will not address it.

Affirmed in part. Reversed and remanded in part.

GLAZE, J., not participating.