2009 Ark. App. 864

**Greg HAYS, Appellant**

v.

**ARKANSAS DEPARTMENT OF HEALTH & HUMAN SERVICES and Minor Child, Appellees.**

No. CA 09–711.

Court of Appeals of Arkansas.

Dec. 16, 2009.

Gail T. Segers, Fayetteville, for appellant.

Tabitha Baertels McNulty, Office of Chief Counsel, for appellee.

Chrestman Group, PLLC, Jonesboro, by: Keith L. Chrestman, attorney ad litem for minor child.

RITA W. GRUBER, Judge.

Greg Hays appeals the order of the Washington County Circuit Court, Juvenile Division, that adjudicated his son dependent-neglected. The adjudication was based upon the court's finding that the child was at substantial risk of serious harm as a result of neglect and appellant's unfitness as a parent. Appellant raises four points on appeal: (1) there was insufficient evidence to support the court's finding of dependency-neglect; (2) the court abused its discretion in overruling appellant's hearsay objection; (3) the court erred in denying his motions for a directed verdict; and (4) the court erred in denying his motion to dismiss for lack of subject-matter jurisdiction. We affirm.

Appellant and Pamela Hays were divorced in 2007 by order of the Washington County Circuit Court, Domestic Division.

Ms. Hays was awarded custody of their son, their only child, and appellant was granted the court's standard visitation. The visitation schedule included unsupervised, overnight visitations on Tuesdays, every other weekend, and alternating holidays. The proceedings in the present case began on March 10, 2009, when the Department of Human Services (DHS) filed a petition for emergency custody in the Washington County Circuit Court, Juvenile Division.

In its petition, DHS asked the court to adjudicate the Hayses' son dependent-neglected because of substantial risk of serious harm as defined by Ark.Code Ann. § 9–27–303. An affidavit of facts supported DHS's allegations of inadequate supervision and mental injury. Those facts included a January 30, 2009 telephoned 911 report of inadequate supervision, based upon appellant's alleged intoxication while parked in his car with the child; DHS's subsequent investigation and true finding for inadequate supervision based upon concerns about appellant's drinking problems; and the opinion of the child's therapist that the child had suffered mental injury from appellant, who had taken no reasonable action to minimize mental injury resulting from the divorce but had caused additional harm by forcing the child to discuss uncomfortable situations and placing him in harmful situations. DHS, recommending only supervised visitation between appellant and son, requested suspension of unsupervised visits until services could be provided.

The juvenile court's April 24, 2009 adjudication of dependency-neglect was based upon the court's findings that appellant had failed to supervise the juvenile due to drinking, had caused him mental and physical injury due to alcohol abuse, and was an unfit parent because of alcohol abuse. The order required appellant to attend AA meetings at least twice weekly, to undergo psychiatric evaluation, and to participate in any counseling recommended by the psychiatrist. The order further required both appellant and Ms. Hays to refrain from using alcohol; to maintain clean, safe homes for themselves and their son; and to demonstrate the ability to protect the child and keep him safe from harm. Appellant's telephone conversations with the child and appellee were restricted, only supervised visitation was allowed, and appellant was warned that termination of his parental rights could result should he fail to correct conditions.

Witnesses at the adjudication hearing included Ms. Hays; police officer Stacey Younkin; Karen Scott, a social worker and the child's therapist; case worker Lori Suntken; appellant; and Fayetteville Country Club's golf pro, William Agler. Much of their testimony focused on appellant's visitation, Ms. Hays's telephone call to 911, and the child's behavior and therapy sessions after his parents' divorce. Appellant's regular visitation schedule was every other weekend, one mid-week night, and alternating holidays. Appellant sometimes kept his son at other times, and they participated in scouting and golfing activities together. The child began counseling sessions with Scott about a year and a half before the adjudication hearing, and at Ms. Hays's instigation.

Documentary evidence and testimony revealed that Ms. Hays telephoned 911 to report inadequate supervision the afternoon of January 30, 2009. She alleged that appellant was intoxicated while the child was in his car. Officer Younkin was dispatched to the reported location, a Harp's parking lot, but was unable to find the father and son. Soon afterward Ms. Hays again phoned 911, and the officer was sent to make a welfare check on the child.

Officer Younkin testified that she was dispatched to appellant's home about an hour after failing to find him in the car. Through the glass door at the front entrance, she saw appellant and his son watching television. She knocked on the door and made contact with them. She observed that appellant was unsteady on his feet and his breath had a strong odor of intoxicants. She said that his speech was slurred, and his eyes were bloodshot and watery. He told her that his son was going to bed after they watched television and that they were home for the rest of the night. When she asked the child if he was okay, he replied that he had just finished making dinner and eating. She observed that the house was clean and that the child was ready for bed. Although she believed appellant to be intoxicated and was concerned about his "intoxicated state," she felt that the child's basic needs were taken care of, he was in no imminent danger, and he was safe for the night. The officer took no further action.

According to Ms. Hays's testimony, she approached appellant's parked car at Harp's after seeing that he and their son were sitting in it. She could tell that appellant had been drinking because his eyes were red, his head was "bobbing," and she smelled alcohol when he eventually rolled down the window in response to her requests. She asked him what was going on, and he said that he and their son were "just straightening things out." The boy looked down, with his mouth open, and Ms. Hays told him he needed to get out of the car. She attempted to reach inside the window to unlock the doors, but appellant rolled up the window on her arm. He put the car in drive, she pulled her arm out of the window, he drove away and "flipped her off," and she called 911. The next day, after spending the night with appellant, the child acted as if everything was fine and did not want to talk about the incident.

Ms. Hays testified that the child had told her about finding empty bottles in the garbage and knowing where appellant hid wine. The boy also told her that he "could've died" at times, including November 2008 when appellant had been drinking and hit a tree with their golf cart while they were on the country club golf course. She said that she had told the child to telephone her if he ever felt unsafe, but he had said he was afraid to call her.

Ms. Hays said that she did not tell appellant until November 2007 about their child's therapy, that she had not told the child not to tell him, and that she thought this was in the child's best interest and had paid for the sessions without asking appellant to do so. She said that appellant's use of alcohol was one reason for the divorce. She did not believe that he would refrain from confronting their son about his counseling sessions or what was said in the courtroom. She believed that appellant had been drunk in the parking lot and that he had called the house while intoxicated since then. She was concerned about their son's safety and did not believe the situation would correct itself.

Karen Scott testified that the child's presenting problems at counseling were "extreme anger and acting out." The issues after the divorce were his parents not getting along, his anger at school, and other problems in the classroom. Scott said that the boy had shown "a lot of big stress and anger in his play therapy" in recent months before the hearing and had begun talking about his father's drinking. He had shown that he was "hurt and sad" since the parking-lot incident in January and talked about hitting a tree in a golf cart, "thinking that his father had been drinking while driving the golf cart." She

said she had been concerned in the months before the hearing about visitation.

It was Scott's opinion that the child was stressed when he was with his father. She said that the child had talked about appellant's anger, and she had concerns about their relationship. Regarding the DHS investigator's allegation of mental injury, Scott observed:

> [T]he mental seems to be he behaves very well at father's, doesn't give an indication apparently to his father that he is upset. He does tell me that he tells his father to stop drinking, but I don't know if he does or not. But his social relationships are not good. And that shows up when a child is upset and stressed. His school performance has improved, but he doesn't seem to know how to be with his peers, and he's angry all the time.

Scott testified that, at the time of the hearing, the child had been showing extreme anger and sadness. His statements about his father sounded like those of a protective parent, and recently he had seemed interested in figuring out his dad's drinking and how he could help. Scott stated that appellant's questioning his son about the therapy seemed to upset him and that she thought he was frightened when he talked. In a January 23, 2009 counseling session, he lay in the fetal position and drew a picture of his father drinking. The picture showed a man with a very angry face, holding a half-empty bottle, with "whisky" written on his legs, arms, and torso. The child said the man was his father, but he did not want to talk more about it. Scott testified that in a February 24, 2009 letter she had submitted for the DHS investigation, she concluded that the child had been subjected to emotional abuse.

Finally, Scott testified that appellant had recently come to her, had seemed genuine, and had said he would not drink in front of his son and would like to come to therapy to work things out. The child had told Scott, however, that he refused to have either parent come, and it was Scott's opinion that it was not currently in the child's best interest to have either parent participate in counseling with him.

Caseworker Lori Suntken testified that DCFS (Division of Children and Family Services) recommended supervised visitation and a drug-and-alcohol assessment for appellant. She recommended that the assessor be fully advised about appellant's alcohol use and problems. She said that, rather than having DHS's restricted visitation, it would be beneficial if a mutual family friend or Arkansas Visitation Exchange could supervise because this would allow golf and other activities that were important to the child.

Appellant testified that he had had nothing to drink before parking at Harp's, when he and his son had been talking about the therapy. Appellant said he might have had one drink afterward at home but did not drink when driving because of having "enough experience with DWIs." Disputing Officer Younkin's statement that the child was ready for bed at appellant's home and had made dinner, appellant said that the officer came before shower time and that he and his son had made spaghetti together. He denied that he had been drinking when the golf cart hit "a sapling," explaining that the accident occurred when he reached for his cell phone. He said that he had damaged the cart later in the same round of golf, breaking the axle when driving off the cart path while watching his son hit a shot. He admitted that he had to pay for the damage, but he noted that his club bill did not show "bar sales liquor" on the date of the accident.

Appellant testified that, despite having a past drinking problem, he no longer did. He admitted not stopping entirely, could give no date that he had "licked the problem," and admitted that since September or October 2008 he had been barred from having alcohol at the country club. He admitted having four or five DWIs, the last being in February 2006. He testified that he had not gotten a drug-and-alcohol assessment and that he had last had alcohol |₈two or three nights before the hearing. He admitted consuming alcohol in his son's presence and telephoning Ms. Hays while intoxicated, but he denied drinking to excess or pouring a drink in front of the child. He said that he was self-employed and had to account to no one at any certain time on a workday.

Appellant said that until sometime in 2008 he had no idea his son was in therapy, that he asked Ms. Hays and their son about it but could not even find out the name of the therapist, and that he wished he had been involved in the therapy because it obviously pertained to him. He expressed his doubts about Ms. Hays's motives in not asking him to pay for the therapy or filing it under insurance. Under questioning by the court, appellant said he had no good answer for failing to quit drinking for his son's sake. He said that he didn't realize until meeting with his son's therapist the "major problem" the child had about his father's drinking. Appellant told the court that he "didn't see that having a drink or two was gonna hurt anything."

Bill Agler, the country club's golf pro and appellant's friend of forty years, testified as a rebuttal witness. He voiced his belief that appellant had an alcohol problem that needed "to be addressed ... for the protection of his son." Agler said that he had investigated the incident of appellant's hitting the tree. Agler said that appellant was staggering to get to another cart delivered to him by one of Agler's employees and that, in Agler's "guess," the staggering was due to intoxication. Agler admitted that he himself had not observed appellant at the scene of the accident.

### |₉Sufficiency of the Evidence

The appellate court reviews findings in dependency-neglect proceedings de novo but will not reverse the trial judge's findings unless they are clearly erroneous. *Porter v. Ark. Dep't of Health & Human Servs.*, 374 Ark. 177, 286 S.W.3d 686 (2008). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, based on the entire evidence, is left with a definite and firm conviction that a mistake has been committed. *Id.* With regard to testimonial evidence, the appellate court gives a high degree of deference to the circuit court, which is in a far superior position to observe the parties before it, and we defer to the trial judge's evaluation of the credibility of witnesses. *See Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 215, 40 S.W.3d 286, 292–93 (2001); *Crawford v. Ark. Dep't of Human Servs.*, 330 Ark. 152, 951 S.W.2d 310 (1997). Consequently, unless determined to be clearly erroneous, a trial court's finding will be left undisturbed on appeal. *Porter*, 374 Ark. at 183, 286 S.W.3d at 692. Moreover, on de novo review, the appellate court will reverse only on grounds properly argued by the appellant. *See, e.g., Country Gentleman, Inc. v. Harkey*, 263 Ark. 580, 569 S.W.2d 649 (1978).

A dependency-neglected juvenile is any juvenile "at substantial risk of serious harm as a result of neglect or parental unfitness." Ark.Code Ann. § 9–27–303(18)(A) (Repl.2008). Under subsection (36)(A), neglect includes a parent's acts or omissions that constitute "[f]ailure to take

reasonable action to protect the juvenile." Among such failures are a parent's

(iii) Failure to take reasonable action to protect the juvenile from abandonment, abuse, sexual abuse, sexual exploitation, neglect, or parental unfitness when the existence of this ∟₁₀condition was known or should have been known;

(iv) Failure or irremediable inability to provide for the essential and necessary physical, mental, or emotional needs of the juvenile, including failure to provide a shelter that does not pose a risk to the health or safety of the juvenile;

. . .

(vi) Failure, although able, to assume responsibility for the care and custody of the juvenile or to participate in a plan to assume the responsibility; or

(vii) Failure to appropriately supervise the juvenile that results in the juvenile's being left alone at an inappropriate age or in inappropriate circumstances, creating a dangerous situation or a situation that puts the juvenile at risk of harm.

We address appellant's first and third points together. In the first point, he contends that there was insufficient evidence to support the court's finding of dependency-neglect, arguing that there was insufficient evidence to support the allegations of inadequate supervision due to concerns about his drinking problems and that he did not take reasonable action to minimize the degree of mental injury resulting from the divorce. In the third point, appellant contends that the circuit court erred in denying his motions for a directed verdict because DHS did not show circumstances that rose to a level of dependency-neglect under our statute. Under both contentions, he argues that mental injury is not a ground for dependency-neglect in Arkansas law, and that mental injury from the child's being stressed and angry at the divorce and his

parents' bickering, or as a result of his father's drinking alcohol, cannot show statutory dependency-neglect. He additionally argues that even if mental injury were an element of dependency-neglect, he lacked knowledge for over a year that his child was seeing a therapist.

 Under the facts of this case, statutory grounds existed for the adjudication of ∟₁₁dependency-neglect. There was ample evidence that appellant abused alcohol, drank before driving his automobile with his son as a passenger, and drank before wrecking a golf cart in which his son was riding. Appellant acknowledged that he had not stopped drinking at the time of the hearing and had no good reason for not doing so, and it was the opinion of the child's therapist that appellant's drinking caused the child stress and negative behaviors, that the child demonstrated signs of emotional abuse, and that he suffered mental injury caused by appellant. In view of the evidence as summarized above, we have no hesitancy in finding the evidence sufficient to support the circuit court's adjudication that the child was dependent-neglected because appellant failed to supervise due to drinking, caused his son mental and physical injury due to alcohol abuse, and was an unfit parent because of the alcohol abuse.

Appellant raised a hearsay objection to Agler's testimony about appellant's staggering when the replacement cart was brought to him by one of Agler's employees. Noting that Agler did not observe appellant, appellant argued that the statement of the employee was not reduced to writing and did not fall within the business-records exception to hearsay. After allowing Agler to lay a foundation for the testimony, the circuit court overruled the objection.

█ The business-records exception to excluded-hearsay evidence is set forth in Ark. R. Evid. 803(6):

Records of Regularly Conducted Business Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate $\lfloor_{12}$lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

The circuit court is given wide discretion to determine that a business record lacks trustworthiness so as to be inadmissible under the business-records exception to the hearsay rule. *Wildwood Contractors v. Thompson–Holloway Real Estate Agency,* 17 Ark.App. 169, 705 S.W.2d 897 (1986).

█ Here, Agler testified that his duty as the club's golf pro was to present to the club manager a document of Agler's investigation and to make a conclusion regarding appellant's responsibility for damage. He testified that he had determined that appellant should not have been driving the cart because of intoxication, but that an employee of his had actually seen appellant at the time of the accident. The circuit court allowed the testimony after ruling that Agler's position, duties, investigation, and job description constituted a proper foundation for the business-records exception. No evidence was presented to

the court, however, of a memorandum, report, record, or data compilation of the golf pro's report and conclusions, and portions of Agler's testimony, such as appellant's staggering, were hearsay because they were not his own observations. Therefore the court abused its discretion in allowing the intoxication testimony under the business-records exception to hearsay evidence.

█ We will not reverse a trial court's evidentiary ruling, however, without a demonstration of prejudice. *Schmidt v. Stearman,* 98 Ark.App. 167, 253 S.W.3d 35 (2007). Here, appellant has failed to show any prejudice concerning the circuit court's ruling. The testimony of Ms. Hays, Officer Younkin, the child's therapist, and his caseworker, coupled with appellant's DWI $\lfloor_{13}$convictions and his admissions about use of alcohol, were more than sufficient to substantiate findings that appellant's neglect and parental unfitness arose from alcohol abuse and had a negative effect on the child. Thus, appellant suffered no actual prejudice by Agler's testimony, and its admission was harmless.

## Jurisdiction

█ Arkansas Code Annotate section 9–27–306(a)(1) (Repl.2008) grants juvenile courts exclusive original jurisdiction of proceedings in which a juvenile is alleged to be dependency-neglected. *See also Nance v. Ark. Dep't of Human Servs.,* 316 Ark. 43, 870 S.W.2d 721 (1994), *decision clarified on denial of rehearing,* 316 Ark. 43, 873 S.W.2d 812 (1994) (holding that juvenile court, having found child to be dependent or neglected, had authority to change custody of child to father even though father's petition to modify custody order from divorce decree was not transferred to juvenile court). The juvenile court's transfer-of-custody order supersedes any existing court order and remains

838

in full force and effect until a subsequent order of custody is entered by a court of competent jurisdiction. *Id.*; Ark.Code Ann. § 9–27–334(a)(2)(A) & (b) (Repl. 2008). Thus, there is no merit to appellant's contention that the circuit court lacked jurisdiction to address visitation between appellant and his son.

Affirmed.

ROBBINS and KINARD, JJ., agree.