2010 Ark. App. 246

**Angela Michelle JACKSON, Appellant**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES and Minor Child, Appellees.**

**No. CA 09–1161.**

Court of Appeals of Arkansas.

March 10, 2010.

Deborah Ruth Sallings, Arkansas Public Defender Commission, Little Rock, for appellant.

Keith L. Chrestman, Chrestman Group, PLLC, Jonesboro, Tabitha Baertels McNulty, Little Rock, for appellees.

KAREN R. BAKER, Judge.

Appellant, Angela Michelle Jackson, appeals the Nevada County Circuit Court's adjudication of her daughter, K.J., dependent-neglected. On appeal, she argues that there was insufficient evidence to support the court's determination that she failed to protect K.J. For the reasons set forth below, we affirm.

K.J., fourteen years of age, was taken into custody on an emergency basis on April 8, 2009, after a report was made to the Child Abuse Hotline that K.J. had disclosed to her counselors that she had been sexually abused by her stepfather, Chester Jackson. Specifically, K.J. told her counselors that Jackson had touched her inappropriately and had digitally penetrated her. According to K.J., the abuse occurred approximately two times a week for several months. The trial court entered an emergency order on April 13, 2009, granting custody of K.J. to the Department of Human Services. On April 15, 2009, the court found that there was probable cause that the emergency conditions which necessitated removal of K.J. from the custody of her mother continue so that it is necessary that K.J. remain in the custody of DHS, and it is contrary to the welfare of the child to be returned home. At that hearing, the court ordered that the parents undergo psychological evaluations, counseling and parenting classes, and also ordered that there be no contact between Mr. Jackson and K.J. In a May 26, 2009 placement order, the court granted temporary custody of K.J. to K.J.'s grandparents, Damon and Peggy Page.

On July 14, 2009, an adjudication hearing was held. At that hearing, investigator Shelia Halsell testified. She testified

that she spoke with K.J. briefly about the allegations before visiting K.J.'s home to perform a safety assessment. At the home, Ms. Jackson appeared to be "very upset" and repeatedly told Halsell that K.J.'s allegations were not true. Ms. Jackson told Halsell that K.J. was "lying" and that K.J. and Mr. Jackson were "never alone together." Halsell testified that based on her observation, K.J.'s grandmother, who was also present, did not believe K.J.'s allegations either. Halsell testified that K.J. was "upset" because she was being taken into DHS custody and that K.J. said things such as "I should never have told anybody." Halsell testified that she specifically questioned K.J. as to whether she was ever alone with Mr. Jackson. K.J. told her that Jackson would watch her and her brother when her mother worked late. K.J. told Halsell that while her brother was in his room playing video games, Jackson would "feel of her breasts and stick his finger inside of her." Halsell testified that K.J. had neither recanted her story nor changed the details of her story.

Becky Reeves with the Arkansas State Police, Crimes Against Children Division, testified that upon receiving the hot-line report, she went directly to the Jackson residence. Ms. Jackson met [3]her at the front door. Ms. Jackson said to Reeves that she knew why Reeves was there and told her that K.J. had lied about the accusations. Ms. Reeves said that Ms. Jackson then directed K.J. to go outside and "tell [Reeves] the truth." Reeves asked K.J. to accompany her to her vehicle so that Reeves could ask her some questions in a more private setting. It was there that Reeves conducted the initial interview. Based on the accusations by K.J.'s mother that K.J. was lying, Reeves spoke with K.J. about being truthful. K.J. indicated to Reeves that she would tell the truth. The interview continued, and K.J. told her

that after school, Jackson would care for her and her brother while her mother was still at work. K.J. said that beginning in July 2008, and continuing on multiple occasions, Jackson would sit beside her in the living room and "put his hand inside her clothing, her pants, underwear, and digitally penetrate her vagina." This disclosure prompted Reeves to contact DCFS so that a safety plan could be implemented.

Reeves explained that as she interviewed K.J., Mr. Jackson paced around the vehicle. Reeves stated that K.J. was crying "very hard" during the interview and that "[i]t was very intimidating even to [her] and [she] was not the one being interviewed." Reeves stated that she found the allegations to be true and found K.J. to be credible. Reeves spoke to K.J.'s counselor, who also said that she thought K.J. was being truthful in her allegations. On cross-examination, when asked if she had received any information that had caused her to doubt K.J.'s statement, Reeves testified that she had been told of some behavioral problems that K.J. was experiencing at school. She testified that in her experience, it was not uncommon for abused children to have behavior problems. Reeves was also told that K.J. was "low functioning" and that she had received mental health services. Also on cross-examination, Reeves testified that upon arriving at K.J.'s home to [4]interview her, Reeves learned that K.J. had had her cell phone taken away from her by her parents the night before. Reeves stated, however, that K.J. losing her cell phone privileges would not necessarily have had any impact on her investigation.

Linda Stokes is a Family Service Worker in Nevada County. She was assigned to this case. She prepared a report for the hearing and developed a case plan for the family. She testified that K.J. gave her the same information that she had

given Ms. Reeves—that her stepfather had fondled her and molested her. She testified that DHS had provided the following services to the family: counseling, psychological evaluations, parenting classes, visitation between K.J. and her mother, and placement of K.J. with her grandmother. She testified that K.J. was doing well in her grandmother's custody. There had been two incidents with K.J. while she lived with her grandmother. In one incident, K.J. slipped out of the house around two o'clock in the morning. Her grandmother found her standing at the end of a driveway with a boy. K.J. began screaming and saying to her grandmother that the boy had "hurt [her]." Ms. Stokes testified that K.J. did not tell her the truth about the incident with the boy and that K.J. was not completely honest about the situation; however, the dishonesty did not "change [her] opinion of [K.J.'s] original story." In another incident, after K.J. was taken into foster care, Ms. Stokes received a call from K.J.'s foster parent, who told Stokes that K.J. had come home from school saying that her mother and stepfather had tried to take her from the school. When Stokes spoke to school officials the next day, officials informed her that K.J.'s mother and stepfather had not been to the school the previous day. As to the two incidents, Ms. Stokes said that "it's not uncommon for the child to act out when they get removed from the home in situations like this. [K.J.'s] behavior didn't give [her] any pause or doubt about [K.J.'s] original story. I have no reason to believe that [K.J.] is not telling the truth." On cross-examination, Ms. Stokes testified as to a couple of other occasions when K.J. had been in trouble. They included K.J. losing cellular-phone privileges for texting at midnight against her mother's rules, suspension from school for lashing out at her teacher, and taking her stepfather's cellular phone without his permission, which occurred the night before the allegations were exposed.

Tracey Sanchez, an employee at St. Joseph's Cooper–Anthony, Mercy Child Advocacy Center, also interviewed K.J. During her interview with K.J., she disclosed to Ms. Sanchez the allegations made against her stepfather. Sanchez stated that K.J.'s story was consistent with what she told other officials. Ms. Sanchez explained that consistency in a child's statements was the test used to determine if a child was being dishonest. During the interview, K.J. expressed to Sanchez that her mother did not believe her allegations against her stepfather. When asked why her mother did not believe her, K.J. said that her mother had accused her of lying in the past. K.J. admitted to having lied in the past, but denied having lied about anything similar to the situation at hand. Overall, Ms. Sanchez found K.J. to be consistent and confident in her story, not adding or taking anything away. On cross-examination, Ms. Sanchez said that she had to be focused and very specific with K.J. when asking her questions and found her to be a "little delayed for her age." Specifically, she stated that K.J. was "not as equipped as [she] would find some thirteen-year-olds as far as with their narrative speech and being able to do some free recall." Nonetheless, Sanchez stated that K.J. never hesitated or seemed to have to think about the answers she gave to the questions concerning the sexual abuse.

K.J.'s counselor, Johnna Quinn, testified that she saw K.J. every two weeks. Quinn testified that K.J. disclosed to her the allegations against her stepfather and that the information K.J. gave to Ms. Quinn was consistent with the information given to other officials. Ms. Quinn testified that it was not uncommon for children in this situation to have behavioral problems in school. Ms. Quinn spoke with K.J. about

why her mother did not believe the accusations, and K.J. understood that because she had told lies in the past, that it was difficult for others to believe her. They discussed the fights between K.J. and her mother, and K.J. accepted responsibility for her part in the disagreements. Although K.J. had been untruthful with Ms. Quinn on occasion, that did not make Ms. Quinn doubt K.J.'s story about the abuse. Ms. Quinn also testified that K.J. was "on the lower range of functioning" and received special education services, which could result in an inability to comprehend the severity of the allegations she made. However, Ms. Quinn testified that she had questioned K.J. thoroughly enough that if K.J. had been lying, she would have caught her in that lie.

Another of K.J.'s counselors, Alena Steed, testified that K.J. initially began counseling because of conflicts with her sibling and fights with her mother. During her sessions with K.J., K.J. was open and honest about the allegations and about the fact that she had previously been untruthful in other situations with her mother. Ms. Steed testified that it was approximately three months before the allegations were disclosed that K.J.'s behavior "ratcheted up." However, Ms. Steed testified that K.J. had not done or said anything that would make her doubt her story. After K.J. disclosed the accusations to Ms. Steed, Ms. Steed then spoke with K.J.'s mother. K.J.'s mother denied the allegations, and K.J. told Ms. Steed that "she knew her mother wasn't going to believe her."

K.J. was the next person to testify. The court questioned K.J. initially as to whether she understood what it meant to be truthful, to which K.J. responded "Yes, sir." K.J. then testified about the incident in which she used Mr. Jackson's cellular phone to send text messages late at night.

K.J. stated that her mother caught her using the phone, was very angry with her, and went to the phone company to retrieve a printed copy of the text messages. K.J. admitted that the texting took place the evening before she reported the abuse to the school counselor. K.J. testified that at the time she told her counselor of the abuse, she had already told a couple of her friends about the abuse over the phone.

K.J. testified that the abuse began in July 2008. She stated that when she was sitting on the couch, her stepfather, whom she called "daddy," would "come over there beside [her] and [she] would be wearing shorts or something and he'd put his hand down [her] pants and he'd start feeling of [her] and stuff like that. He was actually touching [her], he was in [her] clothes. He didn't touch [her] anywhere other than down there. He didn't touch [her] breasts." She also testified that "[h]is hand went inside [her] underwear" and that "[h]e put his fingers inside [her] body sometimes." He told her not to tell anyone about what happened. She stated that "[i]t happened a lot." She testified that she did not tell her mother about the abuse because she was "too scared." She also told the court that she had lied in the past, but mostly out of fear of getting in trouble. She stated that she was being truthful now.

Following K.J.'s testimony, her mother Angela Jackson testified. She stated that she and Mr. Jackson had been married for fourteen years and that he was the only father that K.J. had ever known. She stated that Mr. Jackson's mother was usually at the home with the children when she was working. She testified that just before K.J. made the allegations against Mr. Jackson, K.J. had begun to have behavioral issues. For example, K.J. had been in trouble at school and had been suspended. K.J. had also been lying

"more than usual." She stated that K.J. was also in trouble for using Mr. Jackson's cellular phone to text boys late at night. She described her relationship with K.J. as "tumultuous."

Ms. Jackson testified that she learned of the allegations K.J. had made when Ms. Steed and Ms. Reeves arrived at her home. Ms. Jackson denied that she told K.J. to "go out and tell Ms. Becky that it didn't happen." She also denied that Mr. Jackson paced around the vehicle while Ms. Reeves interviewed K.J. She said that as K.J. was taken from the home after her interview with Ms. Reeves, K.J. kept saying that the allegations were not true, but Ms. Jackson did not know if anyone else heard K.J. make those statements. Ms. Jackson did not think K.J. was being truthful about the incident, and she did not believe that the abuse occurred. Ms. Jackson thought K.J. was angry with her and was trying to "get back at" her. She did not believe that Mr. Jackson posed any danger to K.J. in the home.

K.J.'s maternal grandmother, Peggy Page, testified that she was present when the investigators and counselors arrived at the Jackson home and were questioning K.J. Ms. Page testified that K.J. told her that Mr. Jackson had not done anything to her and that she said such things because Mr. and Ms. Jackson were paying more attention to her brother than to her. Ms. Page said that as K.J. was taken from the house, she hugged each of her family members, including Mr. Jackson, and told them she loved them.

Ms. Page explained that K.J. had "changed" a lot over the last year. Ms. Page described an occasion when K.J. snuck out of her house. Ms. Page found her, but when she found her, K.J. began screaming, "Help me, help me, mamaw, he tried to hurt me." K.J. told her grandmother that the boy she had been talking to had "slapped [her]." The boy denied hurting her. K.J. later told her grandmother that the boy had not tried to hurt her. Ms. Page testified that that was the only time she had trouble with K.J. and that things had improved since K.J. began living with her.

Joann Williams testified that the day the investigation began, she was called to K.J.'s home to transport K.J. from her house. She testified that when she first arrived, K.J. was very upset and "pretty hysterical." Ms. Williams helped K.J. get her clothes and other things and carry them out to the car. She saw K.J. hug her family, and she said that she found it odd that K.J. also hugged Mr. Jackson. After K.J. put her things in Ms. Williams's car, K.J. seemed to settle down and began to "joke around about things." Ms. Williams did not hear K.J. tell anyone that the abuse did not happen.

Ms. Steed was called back to the stand. She testified that she did not see any relevance to the testimony that K.J. gave Mr. Jackson a hug before she left. Ms. Steed said that it was typical behavior for an abused person to continue to show love and affection toward the abuser. Ms. Steed then told the court of one occasion when K.J. called her on the phone. It was the night before the investigators arrived at the house. When Ms. Steed answered the phone, she heard Ms. Jackson say, "[K.J.] needs to speak to you." K.J. got on the phone but would not say anything. Ms. Steed could hear Ms. Jackson in the background telling K.J. to tell Ms. Steed that the allegations were a lie. K.J. told Ms. Steed, however, that her mother made her place the call and that the allegations were true.

At the close of the evidence, the court adjudicated K.J. dependent-neglected based on the sexual abuse and the failure to protect. The order reflecting the

court's ruling was entered on July 29, 2009. This appeal followed.

The juvenile code requires proof by a preponderance of the evidence in dependency-neglect proceedings. Ark. Code Ann. § 9–27–325(h)(2)(B) (Supp. 2009); *Brewer v. Ark. Dep't of Human Servs.*, 71 Ark. App. 364, 43 S.W.3d 196 (2001). We review the circuit court's findings of fact de novo, and will not set them aside unless they are clearly erroneous. *Brewer, supra.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, based on the entire evidence, is left with a definite and firm conviction that a mistake has been committed. *Porter v. Ark. Dep't of Health & Human Servs.*, 374 Ark. 177, 286 S.W.3d 686 (2008). With regard to testimonial evidence, the appellate court gives a high degree of deference to the circuit court, which is in a far superior position to observe the parties before it, and we defer to the trial judge's evaluation of the credibility of witnesses. *See Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 215, 40 S.W.3d 286, 292–93 (2001); *Crawford v. Ark. Dep't of Human Servs.*, 330 Ark. 152, 951 S.W.2d 310 (1997). Consequently, unless determined to be clearly erroneous, a trial court's finding will be left undisturbed on appeal. *Porter*, 374 Ark. at 183, 286 S.W.3d at 692.

A dependent-neglected juvenile is any juvenile who is at substantial risk of serious harm as a result of certain acts or omissions, including neglect or parental unfitness, to the juvenile, a sibling, or another juvenile. Ark.Code Ann. § 9–27–303(18)(A) (Supp.2009). Neglect includes a parent's acts or omissions that constitute failure to take reasonable action to protect the juvenile. *See* Ark.Code Ann. § 9–27–303(36)(A). Under subsection (36)(A)(iii), such failures include a parent's failure to take reasonable action to protect the juvenile from sexual abuse when the existence of this condition was known or should have been known. The Code further defines "sexual abuse" to include sexual contact by a caretaker to a person younger than eighteen years of age. Ark.Code Ann. § 9–27–303(51)(C)(i). Subsection 52(A)(i) defines "sexual contact" to mean any act of sexual gratification involving touching, directly or through clothing, of the sex organs, buttocks, or anus of a juvenile or the breast of a female juvenile.

On appeal, appellant does not contend that there was insufficient evidence of sexual abuse against K.J. by the stepfather, nor does she suggest that sexual abuse of K.J. by her stepfather would not support the court's determination that K.J. was dependent-neglected. Appellant's contention, however, is that the trial court erred in finding that she failed to protect K.J. from the stepfather when appellant did not know nor should she have known about the abuse. Given the testimony presented, the issue is one of the weight and credibility of the testimony of appellant and of K.J. In reviewing a dependency-neglect adjudication, we defer to the circuit court's evaluation of the credibility of the witnesses. *Seago v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 767, 360 S.W.3d 733 (citing *Brewer v. Ark. Dept. of Human Servs.*, 71 Ark. App. 364, 43 S.W.3d 196 (2001)). The trial court clearly found credible the child's testimony. K.J. testified that while her mother was at work, Mr. Jackson sexually abused her by putting his hand "inside [her] underwear" and by putting his "fingers inside [her] body." K.J. testified that the abuse had gone on for some time. Ms. Jackson, however, testified that she did not think K.J. was being truthful about the incident, that she did not believe that the abuse occurred, and that she did not believe that Mr. Jackson posed any danger to K.J. in

the home. Given this testimony, we cannot say that the trial court's determination that Ms. Jackson failed to protect K.J. from her stepfather was clearly against the preponderance of the evidence.

Accordingly, we affirm.

PITTMAN and HENRY, JJ., agree.