2010 Ark. App. 671

**Heather WORRELL and Heath Worrell, Appellants**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES, Appellee.**

**No. CA 10–563.**

Court of Appeals of Arkansas.

Oct. 6, 2010.

---

Thomas Wilson, Russellville, for appellant.

Keith L. Chrestman, Jonesboro, Tabitha Baertels McNulty, Little Rock, for appellee.

RAYMOND R. ABRAMSON, Judge.

Heather Worrell and Heath Worrell appeal from the Garland County Circuit Court's adjudication of their seventeen-year-old daughter T.W. as dependent-neglected. They challenge the sufficiency of the evidence supporting the trial court's findings of educational neglect, physical abuse by the father, and failure to protect by the mother. Because the court's abuse and failure-to-protect findings are supported by the evidence, we do not address the issue of educational neglect, and affirm.

DHS filed a petition for emergency custody on January 22, 2010, supported by an affidavit alleging the following:

a. . . . .

The Arkansas Department of Human Services received a referral from the child abuse hotline on 1–20–10 at 10:15 p.m. This matter concerns T.W. who resides with her parents Heath (Brian) and Heather Worrell. The alleged offender is Heath (Brian) Worrell. The report was Heath was mentally unstable and threatened to kill T.W. It was reported that Heath (Brian) shoved T.W. into a wall and hit her in the head. The report also stated Heath (Brian) threw a text book at T.W. and she has a blue bruise on the right side of her rib cage. The report also stated the biological mother Heather is very unstable and maybe bipolar.

FSW Garrard arrived at the home and in the home was Heather Worrell, Rachael Madison (oldest daughter) D.O.B. 6–26–89 SS# . . . and T.W. Worker went over the allegations in the file with Heather and she just kept saying that they were false. Heather said her husband has never threatened to kill her daughter. Heather said her husband also didn't hit her daughter. Heather said her husband was at work at Arby's. Worker explained to Heather that her daughter has to be interviewed. Heather agreed to let T.W. come outside for an interview. When T.W. came outside she was very afraid. T.W. was shacking [sic] and stated that everything in the report was true. T.W. said her father has threatened to kill her and has said it several times. T.W. was crying, shaking and appeared to be very afraid. T.W. said when her father comes home and finds out she told somebody he was going to hurt her. While T.W. was being interviewed her sister Rachael came out of the home. Rachael was very argumentative. Rachael didn't want worker to interview her sister. Worker explained to Rachael that she had to be interviewed.

Heather came outside and told worker that the interview could take place in T.W.'s room since Rachael wouldn't leave the area. When worker got into T.W.'s room she said her parents are

very abusive mentally and physically. T.W. was crying and shaking and said she was afraid to stay in the home. T.W. showed worker her back and she had a light bruise on her back. T.W. stated that her father threw a book at her and pushed her into a wall. T.W. kept saying over and over that she needs help because her parents are really going to hurt her if she keeps staying here. T.W. explained that her sister went into foster care but for some reason she came back home. T.W. said her father will get mad and start abusing her over anything. T.W. said her mother doesn't try to stop her dad because she is crazy too. While worker was interviewing the child Heather bust through the door saying the interview was over and T.W. couldn't say anything else. Worker asked Heather if she was willing to put the child into Ouachita Children's Center until the situation calmed down, and so worker could interview Heath (Brian) Worrell. Heather said her child wasn't going anywhere and worker needed to get out of her home. Worker left the home and waited on police assistance due to the [sic] T.W. being very afraid and Heather being uncooperative. While worker was waiting on police assistance T.W. jumped out of the window with her clothes and started running towards the vehicle for safety.

b. The agency has history with the family from 8–16–06-9–17–07. The family's oldest child Tabitha Worrell was ordered into foster care through a F.I.N.S. From 4–1–08-6–18–08. Tabitha Worrell changed her name while in foster care to Rachael L. Madison. The child received ILP services and aged out of foster care.

The circuit court entered an order for emergency custody on January 25, 2010.

The court held an adjudication hearing on February 25 and March 1, 2010. The witnesses testified about family disputes in October 2009 and January 2010, and the family's history of discord. Heather Worrell testified that she is a self-employed tax preparer and her husband works as an assistant manager at Arby's; they live in the Lake Hamilton School District. She said that she had always home-schooled T.W. and that each year, as required by law, she had filed her notice of intent to home-school T.W. with the school district. She produced the 2009–2010 notice of intent to home school and a list of T.W.'s Solid Rock Home School Academy grades for ninth, tenth, and eleventh grades; they were currently working on the twelfth grade. She said that she had already provided the 2009–2010 notice of intent to home school, as well as a list of subjects and grades for the first three years of high school, to DHS; that T.W. had taken all of the required standardized testing; and that, although she had not provided the documentation of that testing to DHS, no one had asked her for it.

Mrs. Worrell testified that she had never heard Mr. Worrell threaten to kill her or T.W.; that she had never seen him push, throw a book at, or call T.W. ugly names; that T.W. had never reported such incidents to her; and that she had never pushed or slapped T.W. She said that she had never seen any abuse of T.W. and had never had any indication that she was in danger from Mr. Worrell. She said that T.W. ran away to Florida in August 2009, after which they took away some of her privileges. She said that, in October 2009, T.W. admitted that she was having sex with a boy, and they took away all of her privileges for about a month. Mrs. Worrell stated that, in October 2009, T.W. physically assaulted her by repeatedly pushing her, when their pastor was present, at their home; during the incident,

T.W. also bit her father. She said that the incident in January 2010 happened because the Worrells told T.W. that she could not see her new boyfriend again after they learned that he had white supremacist tattoos, was married, and had a child.

T.W. testified that Mr. Worrell had told her and Mrs. Worrell that he should just kill them and then kill himself, which frightened her. She also said that he was frequently angry at her and had threatened to kill her before. T.W. stated that, in October 2009, she and her parents had gotten into a "fight" about an ex-boyfriend. She said that her father had pushed her into a wall while yelling, screaming, calling her foul names, and threatening to kill her. In January 2010, she said, he had thrown a text book at her, leaving a large bruise on her rib cage. She added that he had thrown other objects at her in the past. T.W. stated that her mother had screamed at her, called her foul names, and slapped her.

T.W. denied having plotted to kill her parents, but admitted that she had sent a text message to that effect to her ex-boyfriend after an argument with them. T.W. stated that, on the night that she came into DHS's care, Mrs. Worrell refused the DHS investigator's request that she permit T.W. to go to Ouachita Children's Center for the night and told the investigator to get out of the house. At that point, she said her mother and her sister screamed at her and told her that she was destroying their lives; she then locked her door, grabbed her stuff, and jumped out of the window to go to the investigator's car, because she was in fear for her life. T.W. said that she was still afraid of her parents; that her father had first shoved her when she was ten or eleven years old; that her mother did not listen to her; and that her parents fought with each other all of the time. She admitted hitting her mother in October 2009, but denied biting her father. She also admitted that she had run away from home for about a week in August 2009.

Sheena Garrard, the investigator, testified that Mrs. Worrell was rude when she first went to the home in January 2010. She said that T.W. was crying; appeared terrified; and stated that her father had threatened to kill her several times, that she was afraid, and that she needed help. Ms. Garrard said that she spoke with T.W. alone in her bedroom, where T.W. showed her a bruise on her back. She stated that T.W. was terrified that her father would hurt her when he came home and found out that she had spoken with the investigator. She acknowledged, however, that T.W. may have been embellishing her story.

Ms. Garrard said that she asked Mrs. Worrell if they could put T.W. in Ouachita Children's Center until they could interview the father and figure out what was going on; Mrs. Worrell, however, told her to get out of her house; that T.W. was not going; and that the interview was over. She said that Mrs. Worrell had failed to protect T.W. because she had refused to permit her to leave the situation and was not willing to take T.W. to a safe place. Ms. Garrard also testified that she found educational neglect as to both parents because there were no records of T.W.'s going to public school or being home-schooled. She stated that she had informed the father the day after the investigation began that they needed the educational records; he had responded that his wife dealt with T.W.'s home-schooling. She said that she informed him that Mrs. Worrell needed to call her immediately and give her that information, but she did not do so. Ms. Garrard stated that she had called the Lake Hamilton School Dis-

trict, which had no records for T.W. Ms. Garrard also said that the family's oldest child, Tabitha, had been the subject of a DHS proceeding from August 2006 until September 2007; that she was ordered into foster care from April 1, 2008, through June 18, 2008; and that she had aged out of foster care and changed her name to Rachael Madison.

Heather Findley, the case worker, testified that she had not been able to enroll T.W. in school because she had no education records for her; that she had not been able to verify any standardized testing of T.W., which was necessary for placement; and that, without such records, it would be best for T.W. to obtain her GED. She admitted that she had not asked the parents to produce any records.

Heath Worrell denied ever threatening to kill T.W.; throwing anything at her; bruising her; cursing her; or calling her names. He said that they had disciplined T.W. by talking about the problem, grounding her, taking away privileges, or counseling with their pastor, as they did after she ran away from home. He also said that he had never heard Mrs. Worrell curse or yell at T.W. He testified that T.W. had exchanged text messages with a previous boyfriend about killing her parents and what she could do with the insurance money; the boyfriend stated that it would be taken care of in January. He said that they showed the text messages to their pastor, who notified the sheriff's department, where an investigation was ongoing. Mr. Worrell said that T.W. had been sexually abused by a previous employee of his.

Gary Jennings, the Worrells' pastor, testified that he had counseled their family. He said that he had come to their home, at their request, after they had discovered the text messages T.W. had exchanged with a boy; these messages talked about life insurance and what her parents were worth dead; the boy told her that he was tired of the Worrells treating her badly and that he was going to straighten it out. While he was present, Pastor Jennings said they confronted T.W. with the messages, and a scene ensued; the parents were calm but T.W. was out of control, biting her father on the right shoulder and shoving her mother about three times. Pastor Jennings said that he went to the Garland County Sheriff's office about the text messages.

Rachael Madison, T.W.'s sister, testified that she had never witnessed her parents abuse T.W. or call her ugly names; she had no idea why T.W. would make these allegations.

Frank Morgan, the CASA volunteer, testified that T.W. was very troubled and that her placement in a group home in DHS's custody was exactly what she needed. He said that he had spoken to the parents; his impression was that they were angry about the situation and concerned with how it reflected on them. He said that there was too much hostility on both sides for her to live with her parents at that time.

The court entered an order adjudicating T.W. dependent-neglected on March 5, 2010. The court found, by clear and convincing evidence,[1] that T.W. had been subjected to neglect because of the parents' failure or irremediable inability to provide for T.W.'s essential and necessary physical, mental, or emotional needs. The court noted that both parents had, on numerous occasions, cursed at T.W. and called her derogatory names; that the father had

---

1. Though the circuit court made its findings by clear and convincing evidence, only proof by a preponderance of the evidence is necessary in dependency-neglect cases. Ark.Code Ann. § 9–27–325(h)(2)(B) (Repl.2009).

threatened T.W. with harm and physical abuse; and that the father had physically abused T.W. The court found that T.W. had suffered from bruising caused by the father's throwing an object at her; and that he had pushed and shoved her and threatened bodily harm to her on various occasions. The court also found that the mother had failed to protect her by refusing to place her at Ouachita Children's Center during the course of the investigation and insisting that she remain in the home. The court found that both parents had subjected T.W. to educational neglect by failing to home-school her in accordance with Arkansas law. The court set the case goal of reunification, with a concurrent plan of Another Planned Permanent Living Arrangement, and approved DHS's case plan. The court stated that the parents could have visitation with T.W. when she was ready and telephone contact if her therapist recommended it. The court directed the parents to follow the case plan and court orders; to cooperate with the case worker and CASA volunteer; to stay in weekly contact; to submit to individual and family counseling; to maintain stable employment and housing; to attend all court hearings; to complete twenty hours of parenting classes; to complete an anger management course; to submit to psychological evaluations and follow all recommendations; to give the child's personal property to the case worker; and to produce her records, including educational records. Both parents filed notices of appeal.

Adjudication hearings are held to determine whether the allegations in a petition are substantiated by the proof. Ark.Code Ann. § 9–27–327(a)(1) (Repl.2009). Dependency-neglect allegations must be proven by a preponderance of the evidence. Ark.Code Ann. § 9–27–325(h)(2)(B) (Repl. 2009). We will not reverse the circuit court's findings unless they are clearly erroneous. *Seago v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 767, 360 S.W.3d 733. In reviewing a dependency-neglect adjudication, we defer to the circuit court's evaluation of the credibility of the witnesses. *Id.* The focus of an adjudication hearing is on the child, not the parent; at this stage of a proceeding, the juvenile code is concerned with whether *the child* is dependent-neglected. *Id.* An adjudication of dependency-neglect occurs without reference to which parent committed the acts or omissions leading to the adjudication; the juvenile is simply dependent-neglected. *Id.*

■ Appellants challenge the trial court's finding that Mr. Worrell had abused T.W. Arkansas Code Annotated section 9–27–303(3)(A) (Repl.2009) defines "abuse," in pertinent part, as follows:

(iv) Any injury that is at variance with the history given;

(v) Any nonaccidental physical injury;

(vi) Any of the following intentional or knowing acts, with physical injury and without justifiable cause:

(a) Throwing, kicking, burning, biting, or cutting a child;

(b) Striking a child with a closed fist;

(c) Shaking a child; or

(d) Striking a child on the face[.]

Appellants argue that T.W. was not completely credible, noting that even Ms. Garrard acknowledged that she may have embellished her claims against her father. They also point out that T.W. had threatened to kill them in text messages with her boyfriend and had commented about how much life insurance they had and what she could do with the money. They assert that the primary motivation for T.W.'s jumping out of her window and running to the case worker in January 2010 was because her parents had informed her that

she could not see her boyfriend after what they had learned about him. Although some witnesses questioned T.W.'s veracity, the trial court credited her testimony which, if believed, was more than sufficient to support this finding. We therefore affirm on this point.

Appellants also challenge the trial court's finding that Mrs. Worrell had failed to protect T.W. Arkansas Code Annotated section 9-27-303(36)(A) (Repl.2009) defines "neglect," in pertinent part, as follows:

"Neglect" means those acts or omissions of a parent, guardian, custodian, foster parent, or any person who is entrusted with the juvenile's care by a parent, custodian, guardian, or foster parent, including, but not limited to, an agent or employee of a public or private residential home, child care facility, public or private school, or any person legally responsible under state law for the juvenile's welfare, that constitute:

(i) Failure or refusal to prevent the abuse of the juvenile when the person knows or has reasonable cause to know the juvenile is or has been abused;

. . . .

(iii) Failure to take reasonable action to protect the juvenile from abandonment, abuse, sexual abuse, sexual exploitation, neglect, or parental unfitness when the existence of this condition was known or should have been known;

(iv) Failure or irremediable inability to provide for the essential and necessary physical, mental, or emotional needs of the juvenile, including failure to provide a shelter that does not pose a risk to the health or safety of the juvenile[.]

We also affirm on this point. It is apparent that Mrs. Worrell did not believe T.W.'s allegations against her father; nevertheless, she rejected the investigator's offer to take T.W. to a safe place, at least until the situation settled down and the investigator could interview Mr. Worrell. There is no question that T.W. is a very troubled young woman and that, for whatever reason, her parents cannot control her, keep her safe, or meet her needs. As mentioned above, an adjudication hearing is concerned with the child, not with assigning blame to the parents. With this consideration in mind, we hold that the trial court's adjudication was more than adequately supported by the evidence.

Affirmed.

GLADWIN and GLOVER, JJ., agree.