
# ARKANSAS COURT OF APPEALS

DIVISIONS I & II
**No.** CV-16-1081

| | |
|---|---|
| WILMA TAPP<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br><br>APPELLEES | **Opinion Delivered:** April 5, 2017<br><br>APPEAL FROM THE LOGAN COUNTY CIRCUIT COURT, NORTHERN DISTRICT<br>[NO. 42PJV-16-8]<br><br>HONORABLE TERRY SULLIVAN, JUDGE<br><br>AFFIRMED |

## WAYMOND M. BROWN, Judge

Appellant appeals from the circuit court's adjudication of M.H., born 8/14/2001, as dependent-neglected by appellant. Appellant's sole argument on appeal is that there was insufficient evidence to support the circuit court's finding of dependency-neglect of M.H. by appellant. We affirm.

The Arkansas Department of Human Services (DHS) received a call for DHS assistance with Larry Tapp, son of appellant, on May 26, 2016.[1] A family-services worker went to the home where she was advised by M.H. that M.H. and her sixteen-year-old boyfriend were living together in Larry's home; that appellant, her grandmother, knew her boyfriend was living there; that there had been an altercation in which Larry "grabbed her by the back of the neck" and pushed her head into "the back of a door causing injury to

---

[1]While Larry is discussed as M.H.'s "putative father," appellant states that Larry's twin brother is also a putative father to M.H.

her forehead" after Larry came home and "got mad" because she had not "made any drinks";[2] that Larry used marijuana and had offered marijuana to her, smoking it with her once; that they were sleeping on an air mattress on the living room floor; and that she did not think the house was fit to live in. The family-services worker interviewed appellant, who advised that she has custody of M.H., which she has had since M.H. was seven years old; had not gone to check Larry's house—had "never been"—because she and Larry do not "get along" and so she does not go to his house; did not know the condition of Larry's home; and suspected that Larry was doing drugs, but allowed M.H. to go there because "she [could not] do anything about it." She denied knowing that M.H.'s boyfriend was living in the home.

Finding the home "cluttered," "dirty," and "littered," among other things, and citing health and safety concerns for M.H. stemming from her boyfriend living in the home, appellant's failure to go to the home to check its appropriateness, and reported drug use by Larry, the family-services worker took a seventy-two-hour hold on M.H. on May 26, 2016. DHS filed its petition for emergency custody and dependency-neglect against M.H.'s mother and appellant, as her custodian, on May 31, 2016. The circuit court entered its ex parte order for emergency custody on the same date.

A probable-cause hearing was held on June 7, 2016, and in its June 29, 2016 order, the circuit court found that probable cause existed for M.H.'s removal "specifically, due [to] the custodian/grandmother allowing the juvenile to stay in a home that was not a suitable

---

[2]Larry also "threw" a five-year-old child, according to M.H.

environment because of the environmental conditions and being allowed to have inappropriate contact with her sixteen-year-old boyfriend, as well as being in the presence of domestic violence in the home of the putative father Larry Tapp[.]" It also found that there was probable cause that the emergency conditions that necessitated M.H.'s removal continued so that M.H. would remain in the custody of DHS. The circuit court specifically stated that this finding was "due to failure of the custodian to protect the child, and the conditions of the home of the putative father, including violence in the home." Appellant was thereby ordered to attend parenting classes, obtain and maintain safe, stable, and appropriate housing, and keep DHS apprised of her current contact information.

Following an August 3, 2016 hearing, the circuit court entered its adjudication order on September 23, 2016, in which it adjudicated M.H. dependent-neglected by virtue of being "at substantial risk of serious harm as a result of neglect perpetrated by [appellant], her custodian." With regard to appellant, the circuit court specifically found that she "failed to take action to protect [M.H.] from abuse and neglect by Larry Tapp"; and "failed to provide [M.H.] with shelter that did not pose a risk to her health and safety and failed to appropriately supervise [M.H.], permitting [M.H.] to be in circumstances at the home of Larry Tapp that were dangerous and put [M.H.] at risk of harm." The order went on to state:

> The Court finds that Wilma Tapp has been the legal custodian of [M.H.] for the past seven years and that [M.H.] has been living with her. Wilma Tapp testified that she was moving from an apartment to a house that she was building on some land adjacent to a relative's home and that during the moving process, she permitted [M.H.'s] 16 year old boyfriend to stay at the apartment. Further, she testified that she knew that the boyfriend was staying with [M.H.] at Larry Tapp's home because she talked to [M.H.] daily and [M.H.] told her that the boyfriend was staying in the home. Wilma Tapp testified that she knew about Larry Tapp's history of drug use

and that she never entered the home where she allowed [M.H.] to stay with Larry Tapp. The Court finds that the conditions of the home were reprehensible and unlivable and that Wilma Tapp does not currently have a home that is appropriate for [M.H.] to reside in.

The goal of the case was reunification, and appellant was ordered to obtain and maintain stable and appropriate housing, complete intensive parenting classes, have a psychological evaluation, complete any counseling recommended from the evaluation, and otherwise follow the case plan. This timely notice of appeal followed.[3]

Adjudication hearings are held to determine whether the allegations in a dependency-neglect petition are substantiated by the proof.[4] The DHS has the burden of proving that the children are dependent-neglected by a preponderance of the evidence.[5] The focus of an adjudication hearing is on the child, not the parent; at this stage of a proceeding, the juvenile code is concerned with whether the child is dependent-neglected.[6]

---

[3]Though appellant filed her notice of appeal on August 18, 2016, fifteen days following the hearing, the circuit court did not enter its order until September 23, 2016. Accordingly, we treat appellant's notice of appeal as having been filed on September 24, 2016. *See* Ark. Sup. Ct. R. 6-9(b)(1)(A) Rule of Appellate Procedure–Civil (4) ("If the court announces its ruling from the bench and an appellant files a notice of appeal prior to the entry of the order, it shall be deemed to be filed the day after the order is entered.")

[4]*Harris v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 508, at 1, 470 S.W.3d 316, 317 (citing Ark. Code Ann. § 9-27-327(a)(1) (Supp. 2013)).

[5]*Id.* (citing Ark. Code Ann. § 9-27-325(h)(1) & (2)(B) (Supp. 2013)).

[6]*Id.*, at 1–2, 470 S.W.3d at 317 (citing *Billingsley v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 348; *Worrell v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 671, at 10, 378 S.W.3d 258, 263)). *See Broderick v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 771, at 8–9, 358 S.W.3d 909, 914 (citing *Howell v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 612; *Albright v. Ark. Dep't of Human Servs.*, 97 Ark. App. 277, 248 S.W.3d 498 (2007) ("An adjudication of dependency-neglect occurs without reference to which parent committed the acts or omissions leading to the adjudication; the juvenile is simply dependent-neglected.").

The juvenile code requires proof by a preponderance of the evidence in dependency-neglect proceedings.[7] We review the circuit court's findings of fact de novo and will not set them aside unless they are clearly erroneous.[8] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, based on the entire evidence, is left with a definite and firm conviction that a mistake has been committed.[9] With regard to testimonial evidence, the appellate court gives a high degree of deference to the circuit court, which is in a far superior position to observe the parties before it, and we defer to the trial judge's evaluation of the credibility of witnesses.[10] Consequently, unless determined to be clearly erroneous, a trial court's finding will be left undisturbed on appeal.[11]

Appellant argues on appeal that there was insufficient evidence to support the circuit court's finding of dependency-neglect of M.H. by appellant. In support of this argument, appellant specifically states that while she had custody of M.H., M.H. was visiting Larry at the time DHS became involved, and DHS had had no prior involvement with appellant before this incident. Appellant essentially argues that because the issues giving rise to M.H.'s

---

[7]*Blanchard v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 785, at 8–9, 379 S.W.3d 686, 690–91 (citing Ark. Code Ann. § 9-27-325(h)(2)(B) (Supp. 2009); *Brewer v. Ark. Dep't of Human Servs.*, 71 Ark. App. 364, 43 S.W.3d 196 (2001)).

[8]*Id.*

[9]*Id.*, at 8, 379 S.W.3d at 690–91 (citing *Porter v. Ark. Dep't of Health & Human Servs.*, 374 Ark. 177, 286 S.W.3d 686 (2008)).

[10]*Id.*, at 8–9, 379 S.W.3d at 691 (citing *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 215, 40 S.W.3d 286, 292–93 (2001); *Crawford v. Ark. Dep't of Human Servs.*, 330 Ark. 152, 951 S.W.2d 310 (1997)).

[11]*Id.* (citing *Porter*, 374 Ark. at 183, 286 S.W.3d at 692).

removal occurred in Larry's home, M.H.'s adjudication as dependent-neglected should not have been attributed to her. Additionally, she argues that DHS failed to prove that Larry hit M.H. or that he used drugs and only proved that Larry's home was dirty and that M.H.'s boyfriend stayed overnight in the home, which she argues is insufficient. This court disagrees.

"Custodian" means a person other than a parent or legal guardian who stands in loco parentis to the juvenile or a person, agency, or institution to whom a court of competent jurisdiction has given custody of a juvenile by court order.[12] "Dependent-neglected juvenile" means any juvenile who is at substantial risk of serious harm as a result of neglect or omissions to the juvenile.[13] "Neglect," in part applicable to this argument, means those acts or omissions of the custodian that constitute failure to take reasonable action to protect the juvenile from abuse or neglect when the existence of this condition was known or should have been known;[14] failure to provide for the juvenile's care and maintenance, proper or necessary support, or medical, surgical, or other necessary care,[15] failure, although able, to assume responsibility for the care and custody of the juvenile or to participate in a plan to assume the responsibility;[16] and failure to appropriately supervise the juvenile that

---

[12] Ark. Code Ann. § 9–27–303(14)(A) (Repl. 2015).

[13] *Id.* § 9–27–303(18)(A)(v).

[14] *Id.* § 9–27–303(36)(A)(iii).

[15] *Id.* § 9–27–303(36)(A)(v).

[16] *Id.* § 9–27–303(36)(A)(vi).

results in the juvenile being placed in inappropriate circumstances, creating a dangerous situation or a situation that puts the juvenile at risk of harm.[17] [18] "The statutory definition of a neglected child does not require proof of actual harm or impairment having been experienced by the child.[19] The term 'substantial risk' speaks in terms of future harm."[20]

Even if this court accepts appellant's argument that DHS failed to prove that Larry abused M.H. or that Larry used drugs—and it makes no finding either way—this court finds that the circuit court did not err in adjudicating M.H. dependent-neglected by appellant as the facts support its oral finding that the "conditions of the house [were] just absolutely unlivable." The home in which M.H. was visiting was not simply "dirty" as stated by appellant. The investigator's affidavit and testimony at the hearing, the family-service worker's testimony at the hearing, and photographs show that the only bed in the home was not being used as it was littered with toys and clothing; dishes, trash, clothing and boxes cluttered the home; electrical cords and wiring—"exposed" and "none of it insulated"— ran through various parts of the living room; access to bedrooms was blocked by "piles of

---

[17]Ark. Code Ann. § 9-27-303(36)(A)(viii)*(a)* & *(b)*.

[18]Though appellant asserts in her brief that the circuit court found neglect for failure by a custodian to protect a juvenile from abuse or neglect pursuant to Arkansas Code Annotated section 9-27-303(36)(A)(iii), the circuit court did not state the section pursuant to which it found neglect. Any of the above-referenced sections could have supported its finding.

[19]*Goodwin v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 599, at 3, 445 S.W.3d 547, 549.

[20]*Id.* (citing *Maynard v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 82, at 7, 389 S.W.3d 627, 630).

debris that you had to climb" to obtain entry; "weeds [were] growing through the walls in

the baseboard of the house"; the counter, stove, and floors were "littered with trash, grease

and dirt"; and the bathroom had "no ceiling"—for it had "collapsed"—with wires and

insulation "hanging down and running through the bathroom[,]" including the "top of the

showers." Appellant knew none of this, despite allowing M.H. to visit this home, because

she had "never" been to the home.[21] Furthermore, despite having never been in the home,

appellant testified that this was not the first time M.H. was in Larry's home for "[M.H. has]

been out there before" and appellant "never [had] any concerns with letting her go visit."

Though, as testified to by the family-services worker, there was no document or

order explicitly stating that appellant could not allow M.H. to visit with Larry, that does not

abdicate appellant of the responsibility to ensure that the environment in which the visit

occurs is appropriate for M.H. [22] Appellant knows this, for she testified that "[i]t is [her]

responsibility, as a guardian of [her] grandchild, to be sure she's living or sleeping in a safe

environment." As the custodian of M.H., appellant is responsible for her care, whether with

her or not; appellant failed. The circuit court's adjudication order specifically states "that

---

[21]Appellant initially testified that she had been to Larry's home, and though she was "not going to say [she had not]" been in the home, she "usually [went] to the front porch." However, when asked by the circuit court why she never went to Larry's house, she stated that she "just don't go to anybody's house." Furthermore, her testimony contradicted her statement to the investigator that she had "never" gone to Larry's home.

[22]Appellant also testified to allowing M.H. to continue visits with her mother after M.H.'s allegations that her mother's husband had molested her because the husband did not live in the mother's home.

[appellant] failed to take action to protect [M.H.] from abuse and *neglect* by Larry Tapp."[23] This court cannot find that the circuit court clearly erred.

Appellant also argues that insufficient evidence supported the circuit court's finding that appellant failed to provide M.H. with adequate shelter. This argument relies mainly on the fact that appellant had "suitable" government-assisted housing at the time the hold was taken on M.H. Such an argument ignores the fact that the statute requires proof of the allegations in the petition at the time of the adjudication hearing and at no point earlier.[24]

"Neglect," in part applicable to this argument, means those acts or omissions of custodian that constitute failure or refusal to provide the necessary shelter for the juvenile's well-being with one exception that is inapplicable here,[25] and failure or irremediable inability to provide for the essential and necessary physical, mental, or emotional needs of the juvenile, including failure to provide a shelter that does not pose a risk to the health or safety of the juvenile.[26] At the time of the adjudication hearing, appellant was not ready to take M.H. into her home as she was living is a one-room building—"basically a storage building" that was being converted into a residence—that was "not hooked up" to water, sewage lines , or electricity; had no plumbing; and was "not finished on the inside." She was "diligently working to get her home up and going." Appellant testified that she went

---

[23](Emphasis added.)

[24]*See* Ark. Code Ann. § 9–27–327(a)(1)(A).

[25]S*ee id.* § 9–27–303(36)(A)(ii).

[26]S*ee id.* § 9–27–303(36)(A)(vi).

to her grandson's home next door "to use the facilities and sleep" and that she would have her home "fixed-up soon." If M.H. were allowed to come home, they would stay with appellant's sister until her home was ready, according to appellant's testimony, but she was "not currently" living with her sister. Appellant let M.H. stay with Larry because "that's what she wanted to do" despite appellant's suspicion that M.H. wanted to stay there with her boyfriend, who she admitted she "knew was there" at Larry's home.[27] Again, this court finds no error.

Because this court finds sufficient evidence to support adjudication of M.H. as dependent-neglected by appellant on account of her failure to properly supervise and investigate the home of Larry, which she allowed M.H. to visit regularly, and failure to provide adequate shelter for M.H., this court need not—and does not—address the merits of whether DHS proved that Larry abused M.H., whether Larry used drugs, or whether M.H.'s boyfriend being permitted to spend the night should have been a factor in determining whether M.H. was dependent-neglected.

Finally, appellant argues alternatively that if the evidence supports the finding that M.H. was dependent-neglected, the evidence was not sufficient to support the finding that M.H. should have been removed and placed in foster care. While appellant makes this statement in a conclusory manner that this court is not required to address,[28] she failed to

---

[27]Appellant testified that the mother of M.H.'s boyfriend "didn't want him to come home. She said he's out of control, she can't do nothing with him."

[28]*See Samuels v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 527, at 6, 443 S.W.3d 599, 603 (quoting *Hopper v. Garner*, 328 Ark. 516, 524, 944 S.W.2d 540, 544 (1997) (This court "will not do [appellant's] research" and "will affirm when the appellant's argument is neither supported by legal authority nor apparent without further research.").

raise this argument below.[29] Accordingly, this argument is not preserved for this court's review.

Affirmed.

ABRAMSON, KLAPPENBACH, and VAUGHT, JJ., agree.

GLOVER and HIXSON, JJ., dissent.

**DAVID M. GLOVER, Judge, dissenting.** I respectfully dissent from the majority opinion in this case because I was left with a definite and firm conviction the trial court made a mistake in finding that Wilma Tapp's granddaughter, M.H., was dependent-neglected. I would therefore reverse.

The facts of this case are not in dispute — just whether those facts add up to dependency-neglect. Larry Tapp is M.H.'s putative father, and Wilma is Larry's mother. M.H. has lived with Wilma since M.H. was two years old. Wilma has had custody of M.H. since M.H. was seven years old. When DHS took her into emergency custody, M.H. was fourteen, almost fifteen.

Wilma acknowledged allowing M.H. to go to Larry's house to see M.H.'s much younger halfsiblings. M.H. was apparently there three days and two nights prior to DHS involvement. Wilma also acknowledged an awareness that M.H.'s boyfriend went to Larry's as well, but she said he was supposed to go home at night. When Wilma found out he had spent the night, she demanded he go home. Though she suspected Larry had a marijuana

---

[29]*Lamontagne v. Ark. Dep't of Human Servs.*, 2010 Ark. 190, at 4, 366 S.W.3d 351, 353 (quoting *Roberts v. Yang*, 2010 Ark. 55, at 6, 370 S.W.3d 170, 174 ("With regard to arguments raised for the first time on appeal, we have stated that '[d]e novo review does not mean that this court can entertain new issues on appeal when the opportunity presented itself for them to be raised below, and that opportunity was not seized.'")).

problem, she stated there had never been any incidents when M.H. was there. It is important to note that in the twelve years prior to this episode, DHS had no involvement with M.H. and Wilma. There was no proof Wilma's living conditions were unsuitable at the time M.H. was taken. At the time of the adjudication hearing, however, Wilma acknowledged she was in the midst of turning two storage units, connected by another addition, into a house. Her new house under construction is adjacent to another of her son's and grandson's homes. Her testimony was that her new house was not yet fit for her or M.H. to live in, but she and M.H. could live with either her other son, her grandson, or her sister, Wanda, until she finished construction. Her sister, Wanda, corroborated her testimony. The photos support the notion that Larry's house was unfit to live in, but again, M.H. was only visiting Larry—she lived with Wilma, who is the person who had custody of M.H.

Arkansas Code Annotated section 9-27-303(18)(A)(Repl. 2015) defines a "dependent-neglected juvenile as

> [A]ny juvenile who is at *substantial risk of serious harm* as a result of the following acts or omissions to the juvenile, a sibling, or another juvenile:
>
> | | |
> |---|---|
> | (i) | Abandonment; |
> | (ii) | Abuse; |
> | (iii) | Sexual abuse; |
> | (iv) | Sexual exploitation; |
> | (v) | *Neglect*; |
> | (vi) | Parental unfitness; or |
> | (vii) | Being present in a dwelling or structure during the manufacturing of methamphetamine with the knowledge of his or her parent, guardian, or custodian. |

(Emphasis added.) Arkansas Code Annotated section 9-27-303 (36)(A) defines "neglect":

> "Neglect" means those acts or omissions of a parent, guardian, custodian, foster parent, or any person who is entrusted with the juvenile's care by a parent,

12

custodian, guardian, or foster parent, including, but not limited to, an agent or employee of a public or private residential home, child care facility, public or private school, or any person legally responsible under state law for the juvenile's welfare, that constitute:

(i)      Failure or refusal to prevent the abuse of the juvenile when the person knows or has reasonable cause to know the juvenile is or has been abused;

(ii)      Failure or refusal to provide the necessary food, clothing, shelter, or medical treatment necessary for the juvenile's well-being, except when the failure or refusal is caused primarily by the financial inability of the person legally responsible and no services for relief have been offered;

(iii)      Failure to take reasonable action to protect the juvenile from abandonment, abuse, sexual abuse, sexual exploitation, neglect, or parental unfitness when the existence of this condition was known or should have been known;

(iv)      Failure or irremediable inability to provide for the essential and necessary physical, mental, or emotional needs of the juvenile, including failure to provide a shelter that does not pose a risk to the health or safety of the juvenile;

(v)      Failure to provide for the juvenile's care and maintenance, proper or necessary support, or medical, surgical, or other necessary care;

(vi)      Failure, although able, to assume responsibility for the care and custody of the juvenile or to participate in a plan to assume the responsibility;

(vii)      Failure to appropriately supervise the juvenile that results in the juvenile's being left alone:

     (a)      At an inappropriate age, creating a dangerous situation or a situation that puts the juvenile at risk of harm; or

     (b)      In inappropriate circumstances, creating a dangerous situation or a situation that puts the juvenile at risk of harm;

(viii)      Failure to appropriately supervise the juvenile that results in the juvenile being placed in:

     (a)      Inappropriate circumstances, creating a dangerous situation; or

     (b)      A situation that puts the juvenile at risk of harm; or

(ix)

     (a)      Failure to ensure a child between six (6) years of age and seventeen (17) years of age is enrolled in school or is being legally home-schooled; or

(b)      As a result of the acts or omissions by the juvenile's parent or guardian, the juvenile is habitually and without justification absent from school.

My problems with the trial court's decision include the following:

- the fact that we are talking about a three day/two night period of time;
- there had been no DHS involvement with Wilma and M.H. prior to the episode;
- the deplorable living conditions were at Larry Tapp's house, not Wilma's;
- Wilma allowed M.H. to go to Larry's house because M.H. wanted to visit with her younger halfsiblings;
- the episode leading to DHS involvement occurred at Larry's house, not Wilma's;
- the physical encounter with M.H. involved Larry, not Wilma;
- Wilma had a plan for appropriate living space if M.H. were allowed to come home;
- M.H. was 14 years old, going on 15, i.e., she was not a helpless child who was allowed to go to her father's house;
- the circumstances of prior abuse by M.H.'s mother's boyfriend do not seem to have been relied upon by the trial court; and
- Wilma indicated in her testimony that she would no longer allow M.H. to visit Larry unless Larry remedied the conditions of his home.

Here, if we were confronted with a finding of dependency-neglect concerning the four small children who were actually living with Larry, I would have no problem affirming.

But we are not.  Instead, M.H. just got swooped up into a mess at Larry's house—where she did not live.   When you peel back the facts, the following scenario appears:

- Wilma allowed M.H., who was 14 years old, to spend time with her father and young halfsiblings, knowing that M.H.'s sixteen-year-old boyfriend would be there, but not knowing until the visit was underway that he was also spending the night;
- Wilma did not know how deplorable Larry's living conditions were;
- Wilma suspected Larry had a history of using marijuana, but she did not know of any incidents involving drug use and M.H.; and
- Wilma had no way of knowing that a physical altercation would develop at Larry's house.

In addition, while the facts show that, due to new construction, Wilma's living conditions at the time of the dependency-neglect hearing were not yet ready for M.H., her earlier government-subsidized housing had been fine during the extended time M.H. was living

with her.  Moreover, Wilma had a plan for acceptable living arrangements until her own new house was completed if M.H. were returned to her.

I am at a loss how these facts demonstrate M.H. was "at substantial risk of serious harm" because of "neglect."  No other statutory basis is even remotely applicable.  In my opinion, a finding of dependency-neglect on these facts is clearly erroneous.  I am authorized to state that Judge Hixson joins me in this dissenting opinion.

HIXSON, J., joins in this dissent.

**KENNETH S. HIXSON, Judge, dissenting.**  I join Judge Glover's dissent and write separately to emphasize the unsettling precedent that this case creates.  Bad timing should not cost a parent her child.

- If M.H. had not been *visiting* her noncustodial putative father and her half-siblings on the very weekend that DHS investigated her father, M.H. would not have been caught up in the DHS investigation.
- If M.H. had been visiting her father a week earlier and even if DHS had been summoned, M.H.'s grandmother would have been residing in a government-housing apartment in Delaware, Arkansas—surely satisfactory to DHS.
- Bad timing.

Grandma Tapp took in two-year-old M.H. because M.H.'s mother was unfit. Grandma Tapp informally took care of M.H. from age two to age seven when Grandma Tapp formally was granted custody of M.H.  From age two to age fourteen, there is no evidence in the record that Grandma Tapp neglected M.H.  Then, on the weekend that Grandma Tapp was moving out of the government-housing apartment and renovating a trailer into a residence, she allowed M.H. to visit her father and half-siblings.  On that very weekend, the sheriff went to the father's residence on a domestic-violence call, and M.H. was caught up in the whirlwind of the DHS investigation.  While the condition of the

father's residence was deplorable, even DHS admitted that Grandma Tapp had nothing to do with it. Now, because M.H. was visiting her father and her four half-siblings when the DHS investigation commenced, she is in foster care separated from the only mother she has ever known. This is not a case of dependency-neglect. I would reverse.

Furthermore, in my view, this case has a potentially far-reaching impact. The bottom line in this case is that a grandmother lost custody of her granddaughter to DHS because the grandmother did not perform her own previsitation inspection on her son's home to determine if it was safe for a weekend visit with the granddaughter's half-siblings. The decision to affirm this case provides precedent that threatens visitation and family harmony among mixed-family situations. If a parent, guardian, or custodian does not affirmatively inspect the premises of the host home, then the parent, guardian, or custodian should or could reasonably withhold consent for siblings to visit one another for fear of losing custody to DHS for conditions totally out of his or her control. This could only foster the breakdown of family relationships.

The same would be true for a weekend sleepover at a friend's house. Are we going to invite DHS to take children away from the parent, guardian, or custodian if DHS is called to a friend's host home? Does the parent, guardian, or custodian have to affirmatively inspect the friend's home with the potential penalty for noninspection being DHS intervention and foster care for his or her children? The same DHS whirlwind could play out just the same. This portends to be a slippery slope.

*Tabitha McNulty*, Arkansas Public Defender Commission, for appellant.
*Andrew Firth*, Office of Chief Counsel, for appellee.
*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor child.